**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Plaintiffs' Counsel on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MHA MARK RODMAN d/b/a RODMAN WEDDING PHOTOGRAPHY; ALANA BANNER d/b/a A SALON SANTA FE; ELITE CASINO EVENTS LLC d/b/a EMME PHOTO BOOTH; and DONA & NIK LLC d/b/a MORINA PHOTOGRAPHY, Individually and On Behalf of All Others Similarly Situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE KNOT WORLDWIDE INC.,**<br><br>Defendant. | **Case No.: 2:25-cv-03739**<br><br>**CLASS ACTION**<br><br>**COMPLAINT BASED ON:**<br><br>1) **FRAUDULENT INDUCEMENT;**<br>2) **DECLARATORY RELIEF;**<br>3) **CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**<br>4) **N.Y. GEN. BUS. LAW §§ 349, *ET SEQ.*;**<br>5) **INTENTIONAL MISREPRESENTATION; AND**<br>6) **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

## INTRODUCTION

1.      Mha Mark Rodman d/b/a Rodman Wedding Photopgraphy, Alana Banner d/b/a A Salon Santa Fe, Elite Casino Events LLC d/b/a Emme Photo Booth, and Dona & Nik LLC d/b/a Morina Photography (together the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint for damages, declaratory relief, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant The Knot Worldwide Inc. ("The Knot" or "Defendant") concerning its fraudulent and otherwise unfair business practice of inducing various wedding businesses and vendors to pay thousands of dollars for lead-generating services and advertising when The Knot either does not generate any leads or the leads that it does generate are predominantly fake.

2.      Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief and investigation by their legal counsel.

3.      The Knot is a popular wedding-planning platform used throughout the country that is purportedly used by millions of couples to find their wedding vendors, who pay to advertise on it.[1]

4.      On its website, vendors.theknot.com, The Knot represents its advertising services as allowing vendors to "reach[] the largest audience of engaged couples" and "be seen by more couples with a variety of advertising placement options."[2] The Knot further states that:

---

[1]   https://www.newyorker.com/magazine/2025/04/07/does-the-knot-have-a-fake-brides-problem (last accessed on Apr. 11, 2025).

[2]                              https://vendors.theknot.com/vendors-advertising-dr/?itm_source=theknot.com&itm_medium=referral&itm_campaign=header-nav&_gl=1*199wq3m*_gcl_au*MjA1NjQ3NjczOC4xNzQ0NDEyNzA1*_ga*OTI5MzQ5NzcuMTc0NDQxMjcwNA..*_ga_6XZLY5HEQX*MTc0NDQxMjcwNC4xLjAuMTc0NDQxMjcxMS41My4wLjA.#lp-pom-block-13 (last accessed Apr. 11, 2025).

---

**The Knot advertising helps you show up everywhere couples are looking to book local businesses for their weddings.** Engaged couples come to The Knot to find and book venues, caterers, photographers, florists, planners, officients, and other wedding-day services. We put your business in front of couples at the right time—so you get more high-intent leads and book more weddings. It's that easy …[3]

5.    Vendors drawn in by the above representations, and others, are able to complete a form or call 833-997-0902 to speak with one of The Knot's personnel about the Knot's advertising packages.

6.    If vendors want to "Learn more" about The Knot's advertising and lead-generating services, they are led to another webpage, pros.weddingpro.com, which represents that The Knot, together with WeddingWire, provide "better leads and more bookings" through a program called "WeddingPro."[4] The same website further represents that it provides "9M+ leads delivered to pros annually."[5]

7.    After vendors fill out The Knot's online form, they are then contacted by one of its personnel, whose goal is to have vendors sign up for one of The Knot's advertising packages, which cost anywhere from a few thousand to tens of thousands of dollars, depending on the package purchased.

---

[3] *Ibid.* (emphasis in original).

[4] https://pros.weddingpro.com/?itm_source=theknot.com&itm_medium=referral&itm_campaign=header-nav&_gl=1%2A199wq3m%2A_gcl_au%2AMjA1NjQ3NjczOC4xNzQ0NDEyNzA1%2A_ga%2AOTI5MzQ5NzcuMTc0NDQxMjcwNA..%2A_ga_6XZLY5HEQX%2AMTc0NDQxMjcwNC4xLjAuMTc0NDQxMjcxMS41My4wLjA.&_ga=2.99287196.346307759.1645649078-1564758015.1619820945 (last accessed on Apr. 11, 2025).

[5] *Ibid.*

---

8.     During these calls, The Knot's personnel tell vendors that they could expect several leads each month, with more leads generated if a more expensive advertising package was purchased.

9.     Intrigued by and relying on these representations, vendors, including the Plaintiffs, purchased The Knot's advertising packages, spending thousands of dollars with the expectation of receiving several leads per month.

10.     Once vendors sign up for The Knot's advertising and lead-generating services, some are amazed by the "torrent of leads" that initially arrive "via the Knot's online vendor portal."[6] However, vendors, including the Plaintiffs, have come to realize that sadly, The Knot's generated leads were largely *fake* or non-existent.

11.     In a recent article by The New Yorker, a reporter indicated that "more than twenty wedding vendors who advertise with the Knot told me that they've received inquiries from what they believe are fake brides."[7] In one example, a vendor who spent thousands of dollars per month noticed that the leads who would call him seemed to be reading from a script and would often sound as if they were calling from a phone bank.[8] In other situations, vendors would pay thousands of dollars and receive absolutely no leads.[9]

12.     By engaging in such conduct, including as more fully alleged herein, The Knot has violated and continues to violate California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*. and N.Y. Gen. Bus. Law §§ 349, *et seq*., and its conduct constitutes intentional misrepresentation and unjust enrichment.

13.     Moreover, The Knot fraudulently induced Plaintiffs, including absent class members, into purchasing services that The Knot did not intend to provide.

---

[6] *See, supra*, n.1
[7] *Ibid.*
[8] *Ibid.*
[9] *Ibid.* (referring to one of two hundred formal FTC complaints against The Knot where a vendor wrote, "I paid around $12,000 and got absolutely nothing to show for it.").

14.    Declaratory relief is also appropriate to find the contracts between absent Class members and The Knot, including between Plaintiffs and The Knot, are void or voidable, and that The Knot's conduct is unlawful.

15.    The Knot's conduct caused Plaintiffs, and other similarly situated wedding businesses and vendors, monetary harm and requires declaratory as well as injunctive relief to address and prevent future harm.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity, including because Plaintiffs are citizens of the States of California, New Mexico, Pennsylvania, and New York, respectively, and Defendant is a Delaware corporation with its headquarters and principal place of business in Maryland; (2) the amount in controversy in this matter exceeds $5,000,000, exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative nationwide and the various sub-classes.

17.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) one of the Plaintiffs, specifically Mha Mark Rodman, resides in Los Angeles County, State of California, which is within this judicial district; (ii) much of the conduct complained of herein occurred within this judicial district; (iii) Plaintiff Mha Mark Rodman was harmed by Defendant within this judicial district; and (iv) Defendant conducted business within this judicial district at all relevant times.

18.    The Court also has pendent personal jurisdiction over the claims of the other plaintiffs Alana Banner, Elite Casino Events LLC, and Dona & Nik LLC, based on Defendant's substantially similar misconduct.

## PARTIES

19.    Plaintiff Mha Mark Rodman is, and at all times mentioned herein was, a natural person, an individual citizen and resident of the County of Los Angeles, State

of California, and within this judicial district, who is the sole proprietor of a wedding photography business doing business in West Hills, California, as Rodman Wedding Photography.

20.    Plaintiff Alana Banner is, and at all times mentioned herein was, a natural person, and individual citizen and resident of the County of Santa Fe, State of New Mexico, who is the sole proprietor of a hairdressing business doing business in Santa Fe, New Mexico, as A Salon Santa Fe.

21.    Plaintiff Elite Casino Events LLC is, and at all times mentioned herein was, a limited liability company, which is organized under the laws of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania. Plaintiff Elite Casino Events LLC also does business as Emme Photo Booth.

22.    Plaintiff Dona & Nik LLC d/b/a Morina Photography is, and at all times mentioned herein was, a limited liability company, which is organized under the laws of New York with its principal place of business in Brooklyn, New York.

23.    Upon information and belief, Defendant is a corporation formed under the laws of the State of Delaware, with a principal place of business within the State of Maryland.

24.    Plaintiffs allege that at all times relevant herein Defendant conducted business throughout the United States, including within the State of California, in the County of Los Angeles, and within this judicial district. Plaintiffs also allege that at all times relevant herein Defendant conducted business within the State of New Mexico, in the County of Santa Fe; in the State of Pennsylvania, County of Allegheny; and in the State of New York, County of Kings.

25.    Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant, respectively.

\\

## NATURE OF THE CASE

26.    The Knot is represented to be "the leading wedding and events planning marketplace globally."[10]

27.    The Knot and its flagship brands, such as WeddingWire, Bodas.net, Hitched, and The Bash, serve the wedding market by "connecting couples with local wedding professionals and a suite of personalized wedding websites, planning tools, invitations and registry services."[11]

28.    According to The Knot's website, it operates in over sixteen countries across North America, Europe, Latin America, and Asia. The Knot also touts its "industry-leading global online wedding Vendor Marketplace, connecting couples with local wedding professionals" and purports to connect "4 million+ couples with nearly 850,000 vendors within its global wedding marketplace."[12]

29.    Given its vast resources and operational sophistication, it is difficult to understand how The Knot could so clearly violate the well-established principles of fair, lawful, and honest competition.

30.    At all times relevant hereto, The Knot has and continues to bait and switch wedding vendors into spending thousands of dollars for lead generating and advertising services that are promised to deliver meaningful results when, in reality, such services either generate no leads or leads that are fake.

31.    Specifically, wedding vendors who are drawn in by The Knot's services and representations about its vast network, which purports to connect "4 million+ couples with nearly 850,000 vendors within its global wedding marketplace[,]"[13] sign up to receive a call from one of The Knot's personnel.

32.    Wedding vendors are informed by The Knot's personnel about the benefits

---

[10]  https://www.spectrumequity.com/portfolio/the-knot-worldwide/ (last accessed Apr. 14, 2025).
[11]  *Ibid.*
[12]  https://www.theknotww.com/about-us/ (last accessed Apr. 14, 2025).
[13]  *Ibid.*

of its lead-generating and advertising packages. The Knot's personnel further represent that a wedding vendor will receive more leads per month if they pay for a more expensive lead-generating and advertising package.

33.    Intrigued by and relying on The Knot's (and its personnel's) representations, wedding vendors, such as Plaintiffs, sign up for one of The Knot's lead-generating and advertising packages and then pay The Knot thousands of dollars for its services.

34.    The wedding vendors soon come to realize, unfortunately, that The Knot's lead-generating and advertising services are nothing more than a sham, as they are either left without any meaningful leads or come to realize that many of the leads they do receive are in fact fake.

35.    Each wedding vendor who utilized The Knot's lead-generating and advertising services, including the Plaintiffs, was exposed to the same material misrepresentations and unfair business practices throughout the United States, including in California.

36.    The Knot's conduct is so pervasive that it has recently caught the attention of the Committee on the Judiciary.

37.    Specifically, in a recent letter to the United States Securities and Exchange Commission ("SEC") and Federal Trade Commission ("FTC"), dated March 28, 2025, Senator Charles E. Grassley, who is the Chairman of the Committee on the Judiciary wrote:

> I have recently been alerted of alleged deceptive business practices by The Knot from several Iowa small businesses that suspect they have been defrauded. Namely, they separately told my staff that . . . The Knot . . . assured the business it would advertise them on its website and then provide the businesses with a monthly supply of high-quality leads. However, according to the businesses, The Knot defrauded them by providing leads that were either largely worthless or completely fake.. . . When they had

enough of this treatment, the businesses told my office they had great difficulty . . . to keep their credit cards from being charged, even going as far as to hire an attorney and threaten litigation.

Whistleblowers alleged that roughly 25,000 partners ranging from mom-and-pop shops to retailers such as Macy's, Walmart, and Crate & Barrel paid to have their advertisements shown on The Knot's website . . .. However, . . . these advertisements did not appear where they were . . . supposed to—if the ads ran at all. When the whistleblowers brought the problem to management, they reportedly found it was part of an intentional "scheme." The scheme allegedly involved executives instructing the sales support team to bypass The Knot's compliance system to reprogram advertisements to appear on lower-value areas of the website than where the customer paid for. Whistleblowers reported, ". . . executives were instructing support staff to conceal this scheme from the sales team—presumably so we would keep selling."  In fact several former employees said that The Knot . . . had "been committing financial fraud for years . . .."

. . .

Small businesses from across the nation, and corporate retailers, have raised these issues in recent years. For example, 700 people . . . have signed a petition asking congressional leaders to investigate The Knot for fraudulent business practices. Moreover, it was reported last year that The Knot has been accused of "systematically swindling clients for years..." including major corporate retailers . . .." . . . [O]ne FTC complaint against The Knot reportedly claimed "about 70%-80% of the leads are scams." In fact, several news outlets . . . reported The Knot's rampant issues and alleged damaging business practices in recent years. . . .

Whistelblowers have reportedly gone to you with allegations of "ongoing violations of federal laws by both former and ongoing company management." . . .  [I]t is now unclear what, if anything, is being done to investigate

these allegations.

> . . . I would like to know, and I'm sure all these small businesses would as well, whether the allegations raised in the news reporting are true and accurate. If they are, these matters ought to be reviewed so that this type of conduct stops, violators are held accountable, and consumers are protected.[14]

38.    As a consequence of The Knot's unfair and deceptive practices, Plaintiffs and other similarly situated wedding vendors purchased The Knot's lead-generating and advertising services under the false impression and in reliance upon The Knot's representations that those services would actually provide them with numerous and legitimate leads.

39.    Further, as a result, Plaintiffs and other similarly situated wedding vendors paid for lead-generating and advertising services they simply did not receive.

40.    Had Plaintiffs and other similarly situated wedding vendors been made aware that The Knot would not provide the lead-generating and advertising services promised, they would not have signed up for those services in the first place.

41.    The Knot intentionally misrepresented its services to Plaintiffs and others similarly situated in an effort to induce them into agreeing to service commitments lasting approximately one year or longer.

42.    Due to The Knot's false, unfair, and deceptive business practices, along with the other conduct described herein, Plaintiffs and similarly situated wedding vendors each spent thousands of dollars on The Knot's lead-generating and advertising services in California and across the country, and have suffered and continue to suffer harm, including the loss of money and/or property.

43.    This action seeks, among other things, declaratory and injunctive relief, restitution of all amounts unlawfully retained by The Knot, and disgorgement of all

---

[14]    https://www.grassley.senate.gov/imo/media/doc/grassley_to_sec_ftc_-_the_knot.pdf (last accessed Apr. 20, 2025).

ill-gotten profits resulting from The Knot's alleged wrongdoing, as well as actual damages.

44.     Unless enjoined and declared unlawful, The Knot's unfair, deceptive and unlawful conduct will continue into the future, and Plaintiffs and members of the Class will continue to suffer economic harm.

## FACTS SPECIFIC TO PLAINTIFF MHA MARK RODMAN

45.     Plaintiff Mha Mark Rodman d/b/a Rodman Wedding Photography ("Rodman" or "Rodman Photography") is a wedding photographer based out of Los Angeles County, California, who caters to the panoply of cultures that call Los Angeles County home.

46.     Rodman first heard about The Knot in the Summer of 2022, when he learned that many of his direct competitors were featured front-and-center under "Sponsored results" on The Knot's website after conducting a vendor search for "Wedding Photographers" in the Los Angeles area.

47.     Though Rodman did not immediately sign up for The Knot's lead-generating and advertising services in the Summer of 2022, he did browse The Knot's website between that time and October 10, 2023, to learn more about The Knot's services. He also visited The Knot's website on several occasions during that time because some of his clients created their own wedding websites using The Knot.

48.     While browsing The Knot's website as well as its WeddingPro website, Rodman was exposed to several representations concerning the efficacy of The Knot's lead-generating and advertising services, including but not limited to the following:

- Representations that The Knot's services would boost the visibility of his business.

- Representations about the millions of couples who use The Knot to get in contact with vendors like Rodman.

- Representations at the bottom of The Knot's website telling vendors to

"Sign up on The Knot to reach more couples and book more weddings!"

49.    On or about October 10, 2023, Rodman decided to sign up to receive a phone call from The Knot about its lead-generating and advertising services.

50.    Subsequent to filling out the form on The Knot's website, Rodman received an email from one of The Knot's Account Managers, Michelle Armstrong ("Ms. Armstrong"), to schedule a call about The Knot's lead-generating and advertising services.

51.    Ms. Armstrong's email read as follows:

> Hi Mark,
>
> Thank you for your recent inquiry regarding The Knot & WeddingWire. I'm reaching out to schedule a quick call to learn more about your business and how we can help!
>
> With peak engagement season right around the corner, this is a great time to explore your options with us as couples will start to jump right in to plan and book their big day.
>
> When would be a good time to connect? Feel free to call me back or use my calendar link below to find a time that works for you.

52.    After having received the above email, Rodman scheduled an appointment through the calendar link provided and confirmed as such by responding to Ms. Armstrong's email.

53.    On October 12, 2023, Rodman was contacted by Ms. Armstrong about The Knot's lead-generating and advertising services.

54.    During that call, Ms. Armstrong showed Rodman The Knot's WeddingPro platform and touted the benefits of The Knot's website and services. She also went on to explain the benefits Rodman would receive at the two advertising tiers The Knot provided for his regions of interest, Los Angeles and Orange County, including that the higher tier would be more expensive and provide Rodman with

higher placement on search results for similar vendors on The Knot's website.

55.    Intrigued by what The Knot was offering, and wanting to be on the same playing field as his competitors, Rodman agreed to sign up for The Knot's higher tier in Orange County, lower tier in Los Angeles (given that it was the only tier available at the time for that region), and a Banner Ad Spotlight.

56.    After the call with Ms. Armstrong, Rodman received via email a purchase confirmation from The Knot's WeddingPro platform as well as a request to confirm his WeddingPro account. The purchase confirmation set out Rodman's payment terms to The Knot and the various services he signed up for with The Knot.

57.    On or about October 17, 2023, Ms. Armstrong emailed Rodman to follow up on their call. In her email, Ms. Armstrong stated:

> Hi Mark,
>
> Welcome to WeddingPro! I enjoyed getting to know your business and showing you how we can help you in front of more couples! Below you will find an *overview of your listing package* and as well as *important next steps* to set yourself up for success on The Knot and WeddingWire!
>
> As discussed, your purchased a Featured placement in our Wedding Photography marketplace in Orange County, CA & Los Angeles, CA region on The Knot and WeddingWire . . .. After this initial term, you will automatically renew on a monthly basis for as long as you would like to partner with us.
>
> In addition to the above listing, your program also includes:
> -    Spotlight Banner in Orange County, CA
> **Important Next Steps!**
>
> . . .
>
> 2. . . . Please use a different main image for each storefront and vary your content across the two to prevent duplicate

content. Watch <u>this quick video</u> to learn how (and why!) to add valueable content that'll drive leads your way.

. . .

5. . . . Also it's important to note that we provide our couples with templated messages to use when submitting a lead to vendors so some of the verbiage can look identical from one couple to the next but it is a real lead so don't ignore it!

. . .

Last but not least, please let us know if you'd recommend any other businesses who are also in a position to take more weddings and could benefit from more visibility.

Have a great day!

Cheers,
Michelle

58.    That same day, Rodman received an email from The Knot's WeddingPro Vendor Support team asking for four horizontal photographs by October 20, 2023, to be used as part of his Banner Ad Spotlight. Rodman provided The Knot's Vendor Support team these photographs, and on or about October 24, 2023, The Knot's WeddingPro Vendor Support team confirmed that his "Spotlight Banner has been created and will appear online in the next 24 hours."

59.    The Knot's lead-generating and advertising services Rodman signed up for included:

- "Featured Wedding Photographers Orange County Region."

- "Banner Ad – Spotlight Wedding Photographers Orange County Region."

- "Featured Wedding Photographers Los Angeles Region."

60.    Rodman agreed to make twelve monthly payments to The Knot totalling **$14,810.40**, with payment terms starting October 17, 2023.

61.    Rodman sought to make the most of The Knot's promised services. Not only did he add his work to his vendor page, he also included a description of his services, his contact information, and his pricing. Rodman also reached out to his former

clients to post reviews on his vendor page in order to draw more attention to it.

62.    Despite all his efforts, however, Rodman only received two clients out of the multitude of leads The Knot generated for him.

63.    Rodman never saw the Banner Ad Spotlight he purchased from The Knot when he visited its website, which prompted him to call The Knot on several occasions only for The Knot's personnel to inform him that the Banner Ad Spotlight only appeared at certain times.

64.    For the sake of comparison, before signing up with The Knot, and the thousands of dollars he spent on its services, Rodman had nine clients booked within a twelve month period.

65.    While Ms. Armstrong, on behalf of The Knot, represented to Rodman that the leads he would receive were all genuine, most of the leads Rodman reached out to never responded to his messages and were formulaic in nature.

66.    Upon information and belief, most of the leads Rodman received as a result of The Knot's services were fake and/or non-existent.

67.    Frustrated at the fact that—after spending months and thousands of dollars on The Knot's services—he did not receive meaningful leads, Rodman called The Knot to complain and request cancellation of its services before his twelve month commitment was over, but The Knot's personnel would not allow him to do so.

68.    Finally, at the end of his twelve-month commitment, Rodman called The Knot again to complain about its services and request cancellation. In response, The Knot tried to convince him not to cancel by saying that he received several reviews on his account since signing up with The Knot and reassuring Rodman that its platform worked. However, Rodman—recognizing that most (if not all) the reviews on his page on The Knot's website were from former clients and that The Knot's services did not work as promised—demanded cancellation, which was ultimately honored.

69.    Rodman and Class members were harmed as a direct and proximate result of

The Knot's misconduct, including its false, unfair and deceptive business practices.

70.     The false, unfair, and deceptive business practices by The Knot presents an ongoing threat to businesses, as The Knot's misconduct continues to this day.

## FACTS SPECIFIC TO PLAINTIFF ALANA BANNER

71.     Plaintiff Alana Banner d/b/a A Salon Santa Fe ("Banner") runs a hair and makeup salon out of Santa Fe, New Mexico.

72.     Before signing up with The Knot, Banner received several emails from The Knot representing the benefits of its lead-generating and/or advertising services, including a guarantee as to the amount of bookings Banner could receive with The Knot as well as purported testimonials about The Knot's services.

73.     On or about the Summer of 2020, Banner received unsolicited calls from two of The Knot's salespersons, who misrepresented to Banner the various benefits of being on The Knot, including a representation that Banner could get ahead of the game by signing up because not a lot of vendors in her area utilized its services.

74.     On one of her calls with The Knot, Banner was transferred and assigned to an Account Manager,  Abigail Auerbach ("Ms. Auerbach"), who explained to Banner that she could choose from a "Featured" or "Preferred" tier, which was more expensive but guaranteed more visibility on The Knot.

75.     Intrigued by The Knot's representations, Banner signed up for a twelve-month commitment of The Knot's "Featured Wedding Hair & Makeup" service in the Albuquerque, New Mexico, area.

76.     Banner's initial twelve-month commitment cost her, in total, **$1,800**, with monthly payments starting on August 28, 2020, and the commitment ending on August 27, 2021, at which point, Banner's $150 payments and The Knot's services were to continue on a month-to-month basis.

77.     The first couple of months with The Knot showed some promise, as two of the approximately seven leads she received on The Knot's WeddingPro platform became clients.

78.    However, as more time passed and more money was paid to The Knot, Banner received less responses from leads generated on The Knot's WeddingPro platform to a point where only one of approximately ten leads would respond to her messages on average.

79.    The messages Banner received from leads The Knot generated were increasingly formulaic, as many of them would start with the same salutation of "Dear Sir/Madam" and similarly ask for a credit card authorization to start the booking process.

80.    At one point, The Knot would call or send Banner emails informing her that she would need to pay more money to receive visibility on its website.

81.    Realizing that she was not receiving the results The Knot had promised her, including legitimate leads and more bookings, Banner contacted The Knot to complain that the leads she was receiving were fake and to request cancellation of her services. But each time Banner tried to cancel The Knot's services, The Knot's personnel indicated that they would call her back or even transfer her to her Account Manager, Ms. Auerbach, yet each time Banner did not receive a call back or an answer.

82.    Frustrated at The Knot's failure to respond to her requests and to live up to its promises, Banner ultimately stopped monthly payments to The Knot.

83.    Banner and Class members were harmed as a direct and proximate result of The Knot's misconduct, including its false, unfair and deceptive business practices.

## FACTS SPECIFIC TO PLAINTIFF ELITE CASINO EVENTS LLC

84.    Plaintiff Elite Casino Events LLC d/b/a Emme Photo Booth ("Elite Casino") is a business which sells casino-themed party rental services in and around Pittsburgh, Pennsylvania.

85.    In 2017, Elite Casino sought to break into the wedding industry, so it started its Emme Photo Booth service to offer photo and video booth rentals for weddings, celebrations, and other special events in Pittsburgh and its surrounding areas.

86.   Sometime before the Summer of 2017, Elite Casino discovered that many, if not all, of its direct competitors appeared prominently on The Knot's website, which piqued the interest of Elite Casino's personnel and prompted them to review The Knot's website, which indicated that The Knot could provide more leads through its lead-generating and advertising services.

87.   Intrigued by the representations made on The Knot's website, Elite Casino signed up to receive a call in order to learn more about The Knot's lead-generating and advertising services.

88.   On or about July 25, 2017, Elite Casino's personnel received a call from Briana Boyd ("Ms. Boyd"), an Account Executive at The Knot.

89.   During the call, Ms. Boyd touted the benefits of The Knot and discussed the specific Photo Booths category, geographical regions, and tiers Elite Casino could select in considering The Knot's lead-generating and advertising services.

90.   In describing the different tiers The Knot provided, Ms. Boyd indicated that the more money Elite Casino paid, the higher tier it would receive.

91.   Additionally, Ms. Boyd indicated that the highest tier would include a featured vendor service, which would provide more leads in Elite Casino's inbox.

92.    Intrigued by Ms. Boyd's representations, Elite Casino's personnel decided to sign up for a twelve-month commitment of The Knot's Storefront service in the Pittsburgh, Pennsylvania, and West Virginia, regions, which cost approximately $102 per month.

93.   The Storefront service was a featured, preferred placement on The Knot's website with the option of adding images, video, and content to a vendor's page on that website.

94.   After Elite Casino's twelve-month commitment, it remained with The Knot on a month-to-month basis until 2023, at which point it cancelled its agreement with The Knot.[15]

_____

[15] Elite Casino first attempted to cancel its agreement with The Knot in 2022, but

95.    While Ms. Boyde, on behalf of The Knot, represented to Elite Casino's personnel that the leads it would receive were all genuine, most of the leads Elite Casino reached out to never responded to its messages.

96.    In the approximately six years Elite Casino utilized The Knot's Storefront service, it only received nineteen total clients from the various leads that populated on The Knot's platform. And, in general, only one out of eight leads Elite Casino received on The Knot for its Emme Photo Booth service would actually respond to its messages.

97.    Upon information and belief, most of the leads Elite Casino received as a result of The Knot's services were fake and/or non-existent.

98.    Indeed, many of the messages Elite Casino received from leads on The Knot's platform were nonsensical and appeared formulaic and fake.

99.    For instance, on March 26, 2023, Elite Casino received a message from a lead named "Kristina Pelican" with the message "Most rustic and barn" and nothing else—no request for pricing, no specifics about the services requested, etc.

100.    As Elite Casino never received the results it was promised, it did not receive the services promised by The Knot, and it was consequently harmed as a direct and proximate result of The Knot's conduct.

101.    Elite Casino and Class members were harmed as a direct and proximate result of The Knot's misconduct, including its false, unfair and deceptive business practices.

102.    The false, unfair, and deceptive business practices by The Knot presents an ongoing threat to businesses, as The Knot's conduct continues to this day.

\\

\\

was informed that doing so was prohibited until the following year, despite having been told that it would be able to cancel any time after the first twelve-month commitment.

## FACTS SPECIFIC TO PLAINTIFF DONA & NIK LLC

103.   Plaintiff Dona & Nik LLC d/b/a Morina Photography ("Morina") is a wedding photography business based out of Brooklyn, New York, which has been rated one of the top 30 wedding photographers in the USA in 2023[16] and has been recognized for various awards over the years.[17]

104.   When Morina was first exposed to The Knot in or around 2013, The Knot would consistently emphasize that it was a leading marketing company tailored to the wedding industry, that there was no platform that was comparable in the wedding industry, and that signing up for The Knot's services would help Morina generate a significant increase in traffic to Morina's profile and, consequently, lead to a substantial number of bookings for Morina's business.

105.   Having originally started out with The Knot at approximately $300 per month to appear after the first six promoted search results on The Knot's website, Morina eventually upgraded its services to appear as one of the top nine promoted wedding photographers in its area within the last two-to-three years.

106.   In 2022, Morina renewed a twelve-month commitment with The Knot.

107.   Soon thereafter, Morina noticed that it received less legitimate leads and more spam leads to its inbox on The Knot's WeddingPro platform.

108.   Morina also noticed that The Knot was overcharging it for the various services it signed up for. Particularly, Morina agreed to pay The Knot $1,648.90 per month for its services but was instead charged $1,798.80 per month.

109.   Morina also noticed that The Knot increased the cost of each service Morina signed up for when Morina cancelled one of The Knot's services, resulting in a situation in which Morina would be paying approximately the same amount of money to receive less services from The Knot.

---

[16] https://wedvibes.media/ideas-advice/top-30-wedding-photographers-in-the-usa/ (last accessed  Apr. 25, 2025).

[17] https://morinaphotography.com/ (last accessed Apr. 25, 2025).

110.    Concerned about this gradual development over the course of a twelve-month period, as well as The Knot's improper billing practices, Morina contacted The Knot on or about April 25, 2023, via email to complain about The Knot's failure to provide the services it promised Morina, to complain about The Knot's unethical billing practices, and to request that The Knot downgrade Morina's service to a simple listing.

111.    In response, The Knot's personnel set up a call with Morina on May 3, 2023, where they further discussed Morina's concerns.

112.    On May 4, 2023, Morina emailed The Knot's personnel again after having spent time reviewing the leads and bookings that came directly from The Knot from 2021 to 2023. In that email, Morina explained as follows:

- Between April 24, 2021, and May 4, 2023, Morina spent **$52,285** on marketing with The Knot.

- Over a more than two-year period, Morina received close to 800 leads from The Knot and WeddingWire, from which only 47 weddings were booked.

113.    In the same email, after realizing that it was paying too much for The Knot's services, Morina requested to cancel The Knot's services.

114.    On May 5, 2023, one of The Knot's personnel, Nicole Calkin ("Ms. Calkin"), responded to Morina's email, stating that the results outlined by Morina were exceptional and trying to negotiate a way for Morina to remain with The Knot.

115.    On May 6, 2023, Morina responded further explaining that the results it received on other platforms exceeded those received with The Knot.

116.    In an effort to retain Morina's business, another of The Knot's personnel, Kellie Kim ("Ms. Kim"), contacted Morina on May 10, 2023, to offer a 15% discount off a "Spotlight" listing on The Knot, with two of the following options:

- Option 1: "Cancel all WeddingWire Products and leave your Knot listing as is" for $519.56 per month.

- Option 2: "Cancel all WeddingWire Products and upgrade your Knot listing to Spotlight" for $1,251 per month.

117.   Morina opted to go with Option 2, hoping it would lead to better results. As such, Ms. Kim responded on May 12, 2023, to Morina with a generic email listing information on photo requirements, FAQ and pricing, reviews (including a representation that "[v]endors with double-digit reviews average 123% more traffic"), and general best practices.

118.   On May 25, 2023, after The Knot's services started up again for Morina, Morina emailed The Knot again about the Spotlight listing service it signed up for. Particularly, Morina indicated that, during the May 3, 2023, phone call, one of The Knot's personnel represented to Morina that the Spotlight listing would place Morina within the top six search results. However, upon reviewing The Knot's website, Morina realized that The Knot diluted its Spotlight to the first nine search results, placing Morina in a less favorable position than originally anticipated.

119.   On May 26, 2023, Ms. Kim responded to Morina in stating that The Knot transitioned to nine spots in December 2022 in certain areas.

120.   That same day, Morina responded stating that it checked The Knot's website ever since the May 3, 2023, conversation, and that the website only listed six vendors in the Spotlight listing for Morina's area. However, the day Morina appeared on The Knot's Spotlight listing, there were nine.

121.   On June 1, 2023, Ms. Kim responded by stating that The Knot would not satisfy Morina's request to be placed in the first six results for the Spotlight listing.

122.   Since that time, Morina has remained with The Knot but has noticed that it has gradually received less leads and, consequently, less bookings.

123.   Indeed, approximately one of twenty leads received result in a client, and several leads continue to appear fake, as they contain no content.

124.   Morina contacted The Knot many times to complain about the number and nature of leads it was receiving, and each time a complaint was made, leads would

appear to start coming in again for a short period of time and subsequently stall until Morina would call to complain again.

125.    As Morina did not receive the results that were promised and instead had received, on information and belief, many fake leads, Morina was economically harmed as a direct and proximate result of The Knot's conduct.

126.    Morina and Class members were harmed as a direct and proximate result of The Knot's misconduct, including its false, unfair and deceptive business practices.

127.    The false, unfair, and deceptive business practices by The Knot presents an ongoing threat to businesses, as The Knot's conduct continues to this day.

128.    Morina is still paying The Knot for its services but anticipates seeking cancellation in the next few weeks, when its current commitment is set to end.

## TOLLING

129.    Plaintiffs and members of the Classes had no prior knowledge of The Knot's misconduct or of facts sufficient to place them on inquiry notice of the claims set forth herein.

130.    Plaintiffs and members of the Classes did not discover and could not discover, through the exercise of reasonable diligence, the fact that The Knot had sold lead-generating and advertising services which turned out to be often-times fake. The limited, though probative, disclosures and revelations alleged herein require extensive investigation by counsel who suspected, and then became fully aware of, The Knot's misleading conduct. Plaintiffs and members of the Class are justified in expecting that the services offered by The Knot would be legitimate and effective, as that is what The Knot makes them out to be.

131.    No information published by The Knot in the public domain at the time Plaintiffs and members of the Classes signed up for its services sufficed to reveal The Knot's misconduct, including its misrepresentations about its lead-generating and advertising services.

132.   Thus, the statute of limitations did not begin to run until Plaintiffs and members of the Classes first realized that they were not receiving the services promised, including increased number of leads generating more clients and certain placement of advertisements in The Knot's website.

133.   Banner, Elite Casino, and Morina only discovered that The Knot was involved in a pattern and practice of not delivering on its promises with respect to its lead-generating and advertising services only after realizing that The Knot's platform generated less leads, and what seemed like less genuine leads, over time as their commitments were coming to an end.

134.   The nature of The Knot's conduct could not have been revealed until Plaintiffs and members of the Class were exposed to regularly-occuring conduct over a period of time indicating that said conduct was not a one-off occurrence but rather The Knot's pattern and practice of dealing in the marketplace.

135.   The Knot misrepresented its services for years and has continued to do so to date. The Knot did and does so to create the false impression in the minds of Plaintiffs and members of the Classes that its services are worth-while as they generated genuine leads, placed wedding vendors in front of couples' eyes, and guaranteed more bookings.

136.   Plaintiffs and members of the Classes were justified in not bringing their claims earlier based on The Knot's conduct.

137.   Thus, the claims asserted here accrued much later than the time Plaintiffs and members of the Classes signed up for The Knot's services, and this action is timely.

138.   In the alternative, and based on the same facts alleged above, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted here.

139.   Plaintiffs and members of the Classes were unaware of the pattern and practice of The Knot's misconduct when they signed up for The Knot's services.

140.   The Knot's affirmative acts and omissions alleged herein were wrongly carried out in a way that precluded detection of the acts and omissions, as well as the existence, nature, extent, and scope of The Knot's misconduct.

141.   A reasonable person under the circumstances would have no cause to investigate the legitimacy of The Knot's conduct before signing up for its services and would have extreme difficulty in discerning the illegitimacy and inefficacy of The Knot's services they had no reason to suspect in the first place.

142.   In light of the foregoing, Plaintiffs and members of the Classes had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether the misconduct existed until they were exposed to The Knot's pattern and practice of providing illigetimate and ineffective services over a period of months, if not years.

143.   Thus, the statute of limitations as to Plaintiffs' and members of the Classes' claims did not begin to run and has been tolled with respect to the claims that Plaintiffs allege in this case and any others that might relate to it.

## CLASS ALLEGATIONS

144.   Plaintiffs bring this action on behalf of themselves and all others similarly situated.

145.   Plaintiffs are members of and seek to represent a National Class, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All businesses in the United States who signed up for one of The Knot's lead-generating and/or advertising services.

146.   Plaintiff Rodman is also a member of and seeks to represent a California Sub-Class, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All businesses in the State of California who signed up for one of The Knot's lead-generating and/or advertising services.

147.   Plaintiff Banner is a member of and seeks to represent a New Mexico Sub-Class, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All businesses in the State of New Mexico who signed up for one of The Knot's lead-generating and/or advertising services.

148.   Plaintiff Elite Casino is a member of and seeks to represent a Pennsylvania Sub-Class, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All businesses in the Commonwealth of Pennsylvania who signed up for one of The Knot's lead-generating and/or advertising services.

149.   Plaintiff Morina is a member of and seeks to represent a New York Sub-Class, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All businesses in the State of New York who signed up for one of The Knot's lead-generating and/or advertising services.

150.   The California Sub-Class, New Mexico Sub-Class, Pennsylvania Sub-Class, and New York Sub-Class are collectively referred to as the "Sub-Classes."

151.   The National Class and the Sub-Classes are collectively refered to as the "Class(es)."

152.   Excluded from the Classes are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Further excluded from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

153.   Plaintiffs reserve the right to modify the proposed Class definitions, including but not limited to expanding the Classes to protect additional persons and to assert additional sub-classes as warranted by additional investigation.

154.   <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of members of the Classes is unknown to Plaintiffs at this time, based on information and belief, the Classes consist of tens of thousands of businesses in the United States, including at least hundreds of businesses in California alone.[18]

155.   <u>Commonality</u>: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual members of the Classes. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendant;

- Whether Plaintiffs and members of the Class were fraudulently induced into signing up for The Knot's lead-generating and/or advertising services;

- Whether Defendant's conduct was "unlawful" as that term is defined in the UCL;

- Whether Defendant's conduct was "unfair" as that term is defined in the UCL;

- Whether Defendant's conduct was "fraudulent" as that term is defined in the UCL;

- Whether Defendant's conduct violated N.Y. Gen. Bus. Law §§ 349, *et seq.*;

---

[18] https://pros.weddingpro.com/?itm_source=theknot.com&itm_medium=referral&itm_campaign=header-nav&_ga=2.99287196.346307759.1645649078-1564758015.1619820945 ("250K+ pros on The Knot and WeddingWire") (last accessed Apr. 20, 2025).

KAZEROUNI
LAW GROUP, APC

- Whether Defendant acted intentionally, including with the intent to defraud;

- Whether Defendant was unjustly enriched by its unlawful, unfair and deceptive business practices;

- Whether Plaintiffs and members of the Classes suffered monetary damages as a result of Defendant's conduct and, if so, the appropriate amount of damages;

- Whether Plaintiffs and members of the Classes are entitled to injunctive relief, including public injunctive relief; and

- Whether Plaintiffs and members of the Classes are entitled to declaratory relief, including that the contracts are void or voidable and that Defendant's conduct is unlawful.

156. <u>Typicality</u>: Plaintiffs' claims are typical of those of the Classes. Plaintiffs and all members of the Classes have been economically harmed by the same wrongful practices of Defendant. Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of the Classes and are based on the same legal theories in that Plaintiffs signed up for The Knot's lead-generating and advertising services based on the representations and promises made by The Knot and its personnel that such services would generate Plaintiffs and the Classes more leads.

157. <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes and are businesses in good standing within their respective jurisdictions. Plaintiffs' Counsel are competent and experienced in litigating class actions. Plaintiffs have retained counsel experienced in complex class action litigation involving unfair business practices. Plaintiffs have no adverse or antagonistic interests to those of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of Plaintiffs and the proposed Classes.

158. <u>Predominance</u>: Defendant has engaged in a common course of conduct

toward Plaintiffs and members of the Classes, in that Plaintiffs and members of the Classes were induced to sign up and pay for The Knot's lead-generating and/or advertising services. The common issues arising from Defendant's conduct affecting members of the Classes set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

159.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Classes would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

160.   Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to advertise, market, label, promote and package its services in an unlawful, unfair, deceptive and misleading manner, and members of the Classes will continue to be deceived, misled, harmed, and denied their rights under various state laws and common law.

161.   Defendant has acted on grounds that apply generally to the Classes, so that Class certification is appropriate.

\\

\\

\\

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Fraudulent Inducement
### (On Behalf of Plaintiffs and the Classes)

162.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

163.   From an unknown date until the filing of this Complaint, The Knot knowingly represented to Plaintiffs and others similarly situated, through its website and its personnel, that its services were effective and legitimate. Specifically, The Knot represents to its customers that its lead-generating and advertising services would help "reach more couples and book more weddings" and that leads are "real."

164.   The Knot acted intentionally, willfully and purposefully in making these false statements about its services to its customers in the above-alleged manner.

165.   On information and belief, The Knot knows and, at the time of each transaction with its customers, knew its statements were false because there was no way The Knot could consistently generate organic leads for the vast network of vendors who utilized its services.

166.   As alleged above, in Senator Grassley's letter to the SEC and FTC, several whistleblowers have come forward in recent years, and have confirmed that The Knot has and continues to knowingly and intentionally make false statements about the efficacy and legitimacy of its services to make more money.

167.   Plaintiffs and the members of the Classes saw, believed, and relied on The Knot's misrepresentations when deciding to purchase The Knot's services. There was nothing on The Knot's website or in conversations with The Knot's personnel which would have suggested to Plaintiffs and members of the Classes that The Knot would not provide legitimate leads and the advertising services promised.

168.   Relying on The Knot's misrepresentations and omissions, Plaintiffs and the Class entered into an agreement whereby they would pay thousands of dollars as consideration for The Knot's lead-generating and/or advertising services.

169.   Any agreement entered into by Plaintiffs and members of the Classes on one side and The Knot on the other is voidable because it was induced by The Knot's fraud.

170.   As a direct and proximate result of The Knot's intentional and knowing misrepresentations, Plaintiffs and members of the Classes suffered damages in an amount to be determined at trial.

171.   By engaging in the acts described above, Plaintiffs and members of the Classes are entitled to recover exemplary or punitive damages.

172.   Additionally, Plaintiffs and members of the Classes are entitled to have their written contracts with The Knot declared void or voidable, as they were the product of The Knot's fraud.

### SECOND CAUSE OF ACTION
**Declaratory Relief**
**(On Behalf of Plaintiffs and the Classes)**

173.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

174.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

175.   Under California law, declaratory relief may be sought if there is (1) a proper subject for declaratory relief; (2) the existence of an actual controversy relating to the legal rights and duties of the respective parties; and (3) a request that the rights and duties of the parties be adjudged by the court.

176.   There is a proper subject for declaratory relief because Plaintiffs seek a declaration of their rights, and the rights of the Class, with respect to The Knot's conduct alleged in the Complaint.

177.   Several actual controversies relating to the legal rights and duties of Plaintiffs, the Class, and the Knot exist.

178.   As illustrated in the foregoing allegations, there is an actual controversy between The Knot and Plaintiffs (as well as the Classes) concerning, but not limited to, the following: (1) whether Plaintiffs and the Class were fraudulently induced into entering agreements with The Knot; (2) whether the Court should void The Knot's agreements with Plaintiffs and the Class; (3) whether The Knot's practices were unfair and/or fraudulent under the UCL and/or the N.Y. Gen. Bus. Law §§ 349, *et seq.*; (4) whether the Knot intentionally misrepresented it services for financial gain; and (5) whether The Knot was unjustly enriched by Plaintiffs and the Classes.

179.   Plaintiffs, on behalf of themselves and the members of the Classes, request that the court adjudge the rights and duties of the parties.

### THIRD CAUSE OF ACTION
**Violations of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(On Behalf of Plaintiff Rodman and the California Sub-Class)**

180.   Plaintiff Rodman brings this cause of action in the alternative to the legal relief sought herein.

181.   Plaintiff Rodman re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

182.   Plaintiff Rodman brings this claim individually and on behalf of the California Sub-Class for Defendant's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

183.   Plaintiff Rodman and The Knot are each "person[s]" as defined by California Business & Professions Code § 17201.

184.   California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

185.  "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," two of which are at issue here: (1) an "unfair" business act or practice and (2) a "fraudulent" business act or practice.

186.  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

187.  Through the conduct alleged in detail above and herein, The Knot engaged in unfair, deceptive and/or fraudulent business practices in violation of Bus. & Prof. Code § 17200, *et seq*.

### A. *"Unfair" Prong*

188.  The Knot has engaged in acts of unfair competition prohibited by Bus. & Prof. Code §§ 17200, *et seq*.

189.  The utility of The Knot's conduct is greatly outweighed by the harm that conduct caused Plaintiff Rodman and the California Sub-Class.

190.  Plaintiff Rodman and other California Sub-Class members paid thousands of dollars in exchange for leads and advertising space. However, The Knot did not deliver the leads and some of the advertising space it promised. And, on information and belief, many of the leads The Knot did provide were fake.

191.  The California Sub-Class members were required to pay The Knot for lead-generating and/or advertising services that were simply ineffective and/or non-existent for at least a year before Class members were able to cancel their contracts. And, in some cases, such as in Elite Casino's case, Defendant would do anything in its power to prevent and dissuade California Sub-Class members from cancelling their services.

192.  The Knot's conduct is unfair in that it is tied to a violation of the common law—namely, fraudulent inducement in having California Sub-Class members commit to The Knot's ineffective and/or non-existent lead-generating and

advertising services based on the misrepresentation that such services were effective and legitimate.

193.    The Knot's conduct caused substantial injury to other businesses in the marketplace who spent thousands of dollars in exchange for certain services they never received. Such injury was in no way outweighed by a countervailing benefit to competition (there was no countervailing benefit).

194.    There was no way California Sub-Class members could have avoided the injury caused to them because, at no time during their transaction with The Knot and upon reviewing The Knot's representations, were California Sub-Class members made aware that The Knot's services were ineffective and/or illegitimate, as that fact was omitted or plainly misrepresented.

## C. *"Fraudulent" Prong*

195.    The Knot violated the "fraudulent" prong of the UCL by misleading Plaintiffs and the Classes to believe that its lead-generating and advertising services were effective and legitimate when they were not.

196.    Particularly, The Knot makes several representations on its website inducing vendors, like Plaintiff Rodman, to sign up for its lead-generating and/or advertising services to reach more couples and book more weddings.

197.    For example, between the Summer of 2022 and October 10, 2023, Rodman reviewed The Knot's website to determine whether he should sign up to receive a call from one of The Knot's Account Managers for more information about The Knot's lead-generating and advertising services. Among the representations Plaintiff Rodman was exposed to on The Knot's website was the language, "Sign up on The Knot to reach more couples and book more weddings!"

198.    When Plaintiff Rodman received a call from Ms. Armstrong on October 12, 2023, he was promised a Banner Ad Spotlight service—particularly, the "Banner Ad – Spotlight Wedding Photographers Orange County Region"—to appear on The Knot's website above the search results for wedding photographers in the Orange

County area. Indeed, the invoice Rodman received on or about October 17, 2023, and the email he received from The Knot's WeddingPro Vendor Support team similarly indicated that he was signed up for that service. However, whenever Rodman reviewed The Knot's website where the Banner Ad Spotlight was supposed to be, it was missing.

199. The Knot also misrepresented the efficacy and legitimacy of its leads and advertising services. For example, Ms. Armstrong emailed Rodman on October 17, 2023—the day The Knot indicated it would commence services for Rodman—and stated that "it's important to note that we provide our couples with templated messages to use when submitting a lead to vendors so some of the verbiage can look identical from one couple to the next but it is a real lead so don't ignore it!"

200. Despite heeding Ms. Armstrong's advice after services commenced by diligently responding to leads, Rodman rarely received any responses.

201. Compared to having indicated to The Knot that he booked nine clients within twelve months before signing up for The Knot's services, Rodman only received two clients from The Knot within a twelve-month period.

202. Relying on The Knot's misrepresentations, such as those particularly described above, Plaintiff Rodman and other California Sub-Class members purchased The Knot's lead-generating and/or advertising services.

203. Plaintiff Rodman and members of the putative California Sub-Class acted reasonably in purchasing The Knots lead-generating and/or advertising services based on their belief that The Knot's representations were accurate, truthful, and lawful.

204. Plaintiff Rodman reserves the right to allege additional conduct that constitutes further unfair and fraudulent acts or practices.

205. Plaintiff Rodman and the California Sub-Class lost money or property as a result of Defendant's UCL violations because, at a minimum: (a) they would not have purchased The Knot's services on the same terms had they known the true

facts about The Knot's representations; (b) they paid a price premium for The Knot's services due to The Knot's alleged misrepresentations and omissions; and (c) The Knot's services were neither as effective or as legitimate as The Knot represented.

206. The Knot's alleged unfair and fraudulent business practices present a continuing threat to Plaintiffs, the Class, and the public as The Knot continues to engage in unfair and fraudulent conduct that harms businesses and competition.

207. Such acts and omissions by The Knot are unfair and fraudulent, constituting violations of Business & Professions Code §§ 17200, *et seq*.

208. As a direct and proximate result of the acts and representations described above, The Knot has received and continues to receive unearned commercial benefits at the expense of its competitors and the public.

209. As a direct and proximate result of The Knot's unfair and fraudulent conduct described herein, The Knot has been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiff Rodman, who unwittingly provided money based on The Knot's false misrepresentations and omissions.

210. Plaintiff Rodman and members of the California Sub-Class were economically harmed because The Knot took Plaintiffs' and the California Sub-Class's money through unfair and deceptive representations made regarding its services.

211. The conduct of The Knot, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to the California Business and Professions Code. Unless enjoined by the court, The Knot will retain the ability to, and may, continue engaging in unfair and deceptive competition and misleading marketing. As a result, Plaintiff Rodman and the California Sub-Class members are entitled to both injunctive and monetary relief.

212.   Plaintiff Rodman would like to purchase The Knot's services again but cannot be certain that he would be misled in the future unless and until The Knot makes appropriate changes to its representations concerning its services.

213.   Pursuant to Bus. and Prof. Code § 17203, Plaintiff Rodman and the proposed California Sub-Class are entitled to, and hereby seek, injunctive relief to prevent The Knot from continuing the conduct in question.

214.   Additionally, Plaintiff Rodman seeks public injunctive relief regarding The Knot's marketing and sale of lead-generating and advertising services in a way that misrepresents those services' efficacy and legitimacy.

215.   In prosecuting this action to enforce important rights affecting the public interest, Plaintiff Rodman seeks the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

**FOURTH CAUSE OF ACTION**
**New York Deceptive Acts and Practices**
**(N.Y. Gen. Bus. Law §§ 349, *et seq.*)**
**(On Behalf of Plaintiff Morina and the New York Sub-Class)**

216.   Plaintiff Morina re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

217.   N.Y. Gen. Bus. Law § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state are hereby declared unlawful."

218.   N.Y. Gen. Bus. Law § 349(h) further states, in pertinent part, ". . . any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds

defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

219.   N.Y. Gen. Bus. Law § 349 "seeks to ensure an honest market place where trust, and not deception, prevails . . .." *Goshen v. Mut. Life Ins. Co*., 98 N.Y.2d 314, 324 (2002); *accord Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co*., 37 N.Y.3d 169, 176 (2021).

220.   The Knot has engaged in deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 by misleading Plaintiff Morina and the New York Sub-Class to believe that its lead-generating and advertising services were effective and legitimate when they were not.

221.   Plaintiff Morina and the New York Sub-Class are consumers, as that term is used in the context of N.Y. Gen. Bus. Law § 349. *See Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP*, 27 N.Y.3d at 177-78. The Knot's services are consumer-oriented as they are sold to businesses, such as Plaintiff Morina and the New York Sub-Class, who seek to be hired by couples who want to use them for events such as weddings, engagements, and the like.

222.   The Knot's conduct has been, and continues to be, materially misleading because The Knot's conduct is not only likely to mislead a reasonable consumer acting reasonably under the circumstances, but The Knot's conduct *has* mislead Plaintiff Morina and the New York Sub-Class, as is alleged herein.

223.   For example, Morina was mislead by The Knot when it represented that The Knot's services would help Morina generate a significant increase in traffic to Morina's profile and, consequently, lead to a substantial number of bookings for Morina's business, even though that was not the case.

224.   As a direct and proximate result of The Knot's aforementioned conduct, Plaintiff Morina and the New York Sub-Class have been damaged in an amount to be determined at trial.

225.   The Knot should also be enjoined from continuing to engage in the illegal deceptive business practices of misleading its customers into paying thousands of dollars each for lead-generating and advertising services misrepresented by The Knot as being both effective and legitimate, when they are not.

### FIFTH CAUSE OF ACTION
**Intentional Misrepresentation**
**(On Behalf of Plaintiffs and the Classes)**

226.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

227.   The Knot knowingly misrepresented to Plaintiffs and the Classes, through its website and its personnel, that its lead-generating and advertising services were both legitimate and effective, including particular representations to Plaintiffs that they would be able to reach more couples and book more weddings and that their businesses would be entitled to certain placement on The Knot's website.

228.   The Knot acted intentionally by wilfully and purposefully making inaccurate marketing statements to Plaintiffs and members of the Classes about the legitimacy and efficacy of its lead-generating and advertising services on its website, email advertising, and/or via calls to Plaintiffs and members of the Classes by The Knot's personnel, such as Account Executives and Managers.

229.   As alleged herein, The Knot's representations have been, and continue to be, unfair, deceptive, false, and misleading.

230.   The Knot knew these representations were false and, over a period of years, has continued to make such representations.

231.   Plaintiffs and members of the Classes saw, believed, and relied on The Knot's misrepresentations when deciding to purchase The Knot's lead-generating and/or advertising services, including substantially similar representations made by The Knot's personnel.

232.   As a direct and proximate result of The Knot's intentional misrepresentations, Plaintiffs and members of the Classes suffered damages in an amount to be determined at trial.

233.   By engaging in the conduct described herein, including malicious, oppressive or fraudulent conduct by Defendant, Plaintiffs and members of the Classes are entitled to recover exemplary or punitive damages.

### SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

234.   Plaintiffs bring this cause of action in the alternative to the legal relief sought herein.

235.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further allege as follows:

236.   Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

237.   Plaintiffs and members of the National Class conferred non-gratuitous benefits upon The Knot by purchasing its lead-generating and/or advertising services, which The Knot represented as being effective and legitimate.

238.   Plaintiffs and members of the Classes allege that The Knot owes them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

239.   An undue advantage was taken of Plaintiffs' and the Classes members' lack of knowledge of the deception, resulting in money being extracted to which The Knot had no legal right.

240.   The Knot is therefore indebted to Plaintiffs and members of the Classes in a specific sum—the amount of money each paid for The Knot's lead-generating and/or advertising services, which The Knot should not retain in equity and good conscience.

241.   The Knot is therefore liable to Plaintiffs and members of the Classes for the amount of unjust enrichment.

242.   The Knot's retention of any benefit, whether directly or indirectly collected from Plaintiffs and members of the Classes, violates principles of justice, equity, and good conscience.

243.   As a result, The Knot has been and continues to be unjustly enriched.

244.   Plaintiffs and the Classes are entitled to recover from The Knot all amounts that The Knot has wrongfully and improperly obtained, and The Knot should be required to disgorge to Plaintiffs and members of the Classes the benefits it has unjustly received.

245.   The Knot accepted and retained such benefits with knowledge that Plaintiffs' and members of the Classes  rights were being violated for financial gain. The Knot has been unjustly enriched by retaining the revenues and profits obtained from Plaintiffs and members of the Classes, and such retention under these circumstances is both unjust and inequitable.

246.   As a direct and proximate result of The Knot's unlawful practices and the retention of monies paid by Plaintiffs and members of the Classes, Plaintiffs and the Classes have suffered concrete harm and injury.

247.   The Knot's retention of the non-gratuitous benefits conferred upon it by Plaintiffs and members of the Classes would be unjust and inequitable.

248.   Plaintiffs and members of the Classes are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon The Knot, in a manner to be determined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendant as follows, seeking equitable relief in the alternative to legal relief, where applicable:

- Certification of this action as a class action;
- Appointment of Plaintiffs as Class Representatives;

- Appointment of Plaintiffs' attorneys as Class Counsel;
- That Defendant's wrongful conduct alleged herein be adjudged and decreed to violate the claims made in this case;
- An order declaring the The Knot's contracts with Plaintiffs and the Classes are void or voidable due to fraudulent inducement;
- An Order declaring that Defendant's conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*, and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;
- An Order declaring that Defendant's conduct violated N.Y. Gen. Bus. Law §§ 349, *et seq.*;
- An Order declaring that Defendant's conduct constitutes intentional misrepresentation;
- An Order declaring that Defendant's conduct constitutes unjust enrichment;
- An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;
- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendant's ill-gotten gains, compelling Defendant to pay restitution to Plaintiffs and all members of the Classes, and to restore to Plaintiffs and members of the Classes all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;
- For pre and post-judgment interest on all amounts awarded;
- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17203;
- For public injunctive relief as pleaded or as the Court may deem proper;

- That Defendant be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- Punitive damages including under Cal. Civ. Code § 3294;
- General and compensatory damages in an amount to be determined at trial;
- That Plaintiffs recover their costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5;
- That Plaintiffs and the members of the Classes be granted any other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

249. Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.

Dated: April 28, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: _/s/ Abbas Kazerounian_____
Abbas Kazerounian, Esq.
*ATTORNEYS FOR PLAINTIFFS*

**Additional Plaintiffs' Counsel**
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, UT 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523