LATHAM & WATKINS LLP
Jessica Stebbins Bina (SBN 248485)
*jessica.stebbinsbina@lw.com*
Gregory W. Swartz (SBN 308071)
*greg.swartz@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel.: (424) 653-5500
Fax: (424) 653-5501

Matthew A. Brill *(pro hac vice forthcoming)*
*matthew.brill@lw.com*
Andrew Prins *(pro hac vice forthcoming)*
*andrew.prins@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Defendant The Knot Worldwide Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MHA MARK RODMAN d/b/a RODMAN WEDDING PHOTOGRAPHY; ALANA BANNER d/b/a A SALON SANTA FE; ELITE CASINO EVENTS LLC d/b/a EMME PHOTO BOOTH; and DONA & NIK LLC d/b/a MORINA PHOTOGRAPHY, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

THE KNOT WORLDWIDE INC.,

Defendant.

Case No. 2:25-cv-03739-FMO-JPR

Hon. Fernando M. Olguin

**DEFENDANT THE KNOT WORLDWIDE INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: September 4, 2025
Time: 10:00 a.m.
Place: Courtroom 6D, 6th Floor

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that, on September 4, 2025, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6D of the United States District Court for the Central District of California, located at 350 W. 1st Street, 6th Floor, Los Angeles, CA 90012, Defendant The Knot Worldwide Inc. ("The Knot") will and hereby does move for an order compelling arbitration of the above-captioned dispute pursuant to the Federal Arbitration Act (9 U.S.C. § 2) on the grounds that the Plaintiffs are bound by written agreements to arbitrate the subject matter of their complaint. The Knot further seeks an order staying this action pursuant to 9 U.S.C. § 3.

This motion is based on this Notice of Motion and Motion to Compel Arbitration and Stay Proceedings, the attached memorandum of points and authorities, the Declaration of Jessica Stebbins Bina, the Declaration of Angel Lull, all records and documents on file in this action, and upon such further evidence or argument that the Court may consider.

Dated: June 23, 2025

LATHAM & WATKINS LLP

By: *<u>/s/ Jessica Stebbins Bina</u>*

Jessica Stebbins Bina (SBN 248485)
Gregory W. Swartz (SBN 308071)
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel.: (424) 653-5500
Fax: (424) 653-5501
*jessica.stebbinsbina@lw.com*
*greg.swartz@lw.com*

Matthew A. Brill *(pro hac vice forthcoming)*
Andrew Prins *(pro hac vice forthcoming)*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200

Fax: (202) 637-2201
*matthew.brill@lw.com*
*andrew.prins@lw.com*

*Attorneys for Defendant The Knot Worldwide Inc.*

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ..... 2

A. The Knot and Its Services ..... 2

B. The Knot's Sign-up Process ..... 3

C. The Knot's Terms of Purchase Agreement to Arbitrate ..... 5

D. The Knot's Terms of Use Agreement to Arbitrate ..... 7

E. Plaintiffs' Valid and Binding Agreements to Individual Arbitration ..... 9

1. Plaintiff Rodman ..... 9

2. Plaintiff Santa Fe ..... 10

3. Plaintiff Emme ..... 11

4. Plaintiff Morina ..... 12

F. Plaintiffs Improperly File This Action in Court ..... 12

III. LEGAL STANDARD ..... 13

IV. ARGUMENT ..... 14

A. The Terms of Purchase's Agreement to Arbitrate Binds the Parties ..... 15

B. The Scope of Arbitration Must Be Determined by the Arbitrator ..... 18

C. Alternatively, Plaintiffs Are Also Bound by the Arbitration Agreement in the Terms Of Use ..... 19

V. THE REMAINDER OF THE CASE MUST BE STAYED PENDING ARBITRATION ..... 21

VI. CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
513 U.S. 265 (1995) ........ 13

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
785 F.3d 1320 (9th Cir. 2015) ........ 14

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........ 13

*B.D. v. Blizzard Entertainment, Inc.*,
76 Cal. App. 5th 931 (2022) ........ 17, 19

*Bandy v. Move, Inc.*,
No. 2:24-cv-10492-SB-JPR, 2025 WL 1000334 (C.D. Cal. March 3, 2025) ........ 17

*Bazine v. Kelly Servs. Global, LLC*,
No. 22-cv-07170-BLF, 2023, WL 4138252 (N.D. Cal. June 21, 2023) ........ 18

*CoStar Realty Info., Inc. v. Field*,
612 F. Supp. 2d 660 (D. Md. 2009) ........ 16

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 13

*Dhruva v. CuriosityStream, Inc.*,
131 F.4th 146 (4th Cir. 2025) ........ 20

*Dickey v. Ticketmaster LLC*,
No. CV 18-9052-GW(GJSx), 2019 WL 9096443 (C.D. Cal. March 12, 2019) ........ 17

*Dream Theater, Inc. v. Dream Theater*,
124 Cal. App. 4th 547 (2004) ........ 16

*Frangipani v. Boecker*,
64 Cal. App. 4th 860 (1998) ........ 18

*GKD-USA, Inc. v. Coast Mach. Movers*,
126 F. Supp. 3d 553 (D. Md. 2015) ............ 18

*Gonzales v. Brinker Int'l Payroll Co., LP*,
No. 15-CV-711 MCA/GJF, 2016 WL 9818324 (D.N.M. Nov. 30, 2016) ............ 20

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ............ 15, 18

*Jackson v. Airbnb, Inc.*,
639 F. Supp. 3d 994 (C.D. Cal. 2022) ............ 18

*Kilgore v. KeyBank, Nat'l Ass'n*,
718 F.3d 1052 (9th Cir. 2013) ............ 14

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ............ 15

*Liptak v. Accelerated Inventory Mgmt., LLC*,
No. 2:20-CV-967, 2021 WL 650514 (W.D. Pa. Feb. 19, 2021) ............ 17

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ............ 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ............ 14, 21

*Naimoli v. Pro-Football, Inc.*,
120 F.4th 380 (4th Cir. 2024) ............ 15

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) ............ 18

*Rosenthal v. Great W. Fin. Sec. Corp.*,
14 Cal. 4th 394 (1996) ............ 15

*Rouhi v. Comcast Ctr.*,
2019 U.S. Dist. LEXIS 235693 (D. Md.) ............ 18, 20

*Salameno v. Gogo Inc.*,
No. 16-CV-0487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016) ............ 20

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ............ 14

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......... 19

*United States v. Gilman*,
360 F. Supp. 828 (D. Md. 1973) .......... 18

*Zayanderoudi v. Nat'l R.R. Passenger Corp.*,
No. TJS-22-2455, 2023 WL 4744746 (D. Md. July 25, 2023) .......... 16

**STATUTES**

9 U.S.C.
§ 2 .......... *passim*
§ 3 .......... 21

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

MHA Mark Rodman d/b/a Rodman Wedding Photography ("Rodman"), Alana Banner d/b/a A Salon Santa Fe ("Santa Fe"), Elite Casino Events LLC d/b/a Emme Photo Booth ("Emme"), and Dona & Nik LLC d/b/a Morina Photography ("Morina"), collectively "Plaintiffs," are businesses that all agreed to arbitrate any claims against The Knot Worldwide Inc. ("The Knot"). Specifically, the Terms of Purchase that each Plaintiff agreed to in signing up for advertising services and continuing to do business with The Knot contains a valid, binding arbitration clause. The terms of that clause are broad and explicit: "[A]ny dispute, claim, or controversy arising out of or relating to [the] Agreement, the parties' relationship with each other and/or your use of and access to the Site or the services, including, but not limited to, claims as to whether any services rendered by us or persons employed or engaged by us were improperly, negligently, or incompetently rendered, and any claim or controversy as to arbitrability ('Dispute'), shall be finally and exclusively resolved by binding arbitration . . . ." The Terms of Purchase also provide the opportunity to opt out of the arbitration clause, yet none of the Plaintiffs did so. Although Plaintiffs ignore their agreement to arbitrate, Plaintiffs' Complaint expressly acknowledges that each Plaintiff made an agreement with The Knot for advertising services and that those agreements give rise to Plaintiffs' claims. Accordingly, Plaintiffs are bound by the Terms of Purchase and the arbitration clause contained therein.

Alternatively, even if Plaintiffs were somehow not bound by the Terms of Purchase, they remain bound by The Knot's Terms of Use—which independently require arbitration of Plaintiffs' claims. The Terms of Use expressly govern individuals or businesses that use The Knot's website or services. Vendors agree to the Terms of Use at various points, including when they send inquiries to The Knot to learn more and sign up for services and when they set up their accounts on The Knot's vendor-facing website, WeddingPro. As with the Terms of Purchase, The

Knot's Terms of Use also require that the Plaintiffs arbitrate their claims against The Knot and thus serve as an independent, alternative basis for arbitration.

Instead of honoring their contractual promises to arbitrate their disputes with The Knot, Plaintiffs improperly pursue litigation in this Court. As a result, Plaintiffs' claims cannot proceed in this forum. Each Plaintiff must arbitrate its claims individually. Moreover, since both the Terms of Purchase and Terms of Use expressly delegate all questions regarding arbitrability to the arbitrator, the sole question before this Court is whether there is an enforceable delegation clause. There is. All other issues, including any questions about specific claims and arbitrability, must be decided by the arbitrator.

The Knot respectfully requests that the Court compel Plaintiffs to abide by their contractual commitments to arbitrate and stay this case pending the conclusion of arbitration.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Knot and Its Services

The Knot is a platform that helps couples plan weddings, offering a range of web-based services and content. Declaration of Angel Lull ("L. Decl."), ¶¶ 4-5, 8. In the United States, The Knot facilitates connections between wedding vendors and couples primarily on two of its websites: TheKnot.com and WeddingWire.com (collectively, "The Knot's websites" or "The Knot's platforms").[1] *Id.*, ¶ 7. The Knot's platforms support a variety of wedding vendor categories, including reception venues, photographers, videographers, DJs, wedding bands, caterers, florists, wedding planners, favors and gifts, and cakes. *Id.*, ¶ 6. Vendors contract with The Knot to advertise their services to potential couples and individuals using The Knot's platforms by, among other things, setting up a "storefront" for their businesses that includes information and photos about the vendor and its goods or

[1] In December 2018, TheKnot.com's parent company, XO Group Inc., merged with WeddingWire and became The Knot Worldwide Inc. L. Decl., ¶ 3.

services, appearing in individual searches, and occasionally adding banner ads or similar additional promotions on The Knot's platforms. *Id.*, ¶ 8. The Knot's platforms are free for individuals and couples to use to help plan weddings. *Id.*, ¶ 9.

WeddingPro, which launched in 2019, is The Knot's vendor-facing brand that supports advertising on both TheKnot.com and WeddingWire.com. *Id.*, ¶ 14. In July 2021, vendors began migrating to a personalized WeddingPro portal to manage their subscriptions on both TheKnot.com and WeddingWire.com. *Id.*, ¶ 15. Since then, advertising on The Knot's platforms (i.e., The Knot.com and WeddingWire.com websites) has required a WeddingPro account. *Id.* WeddingPro enables vendors to manage their advertising accounts, including, but not limited to, viewing previous sales orders, viewing their contract terms and subscription information, uploading information necessary for the creation and maintenance of their storefronts or other advertisements, updating information on their public-facing profiles, viewing metrics on the performance of their advertisements, and communicating with potential customers. *Id.*

**B. The Knot's Sign-up Process**

The first step of signing up for any subscription with The Knot is connecting with a representative who helps the vendor select its subscription details, familiarizes vendors with The Knot's platforms and offerings, and answers any questions. *Id.*, ¶ 13. Many vendors make the initial outreach to The Knot through the vendor inquiry forms on The Knot's websites. *See id.*, ¶¶ 10–12; Declaration of Jessica Stebbins Bina ("Bina Decl."), Exs. 1-2. The Knot offers several different subscription packages with varying advertising placements and prominence (tiers), as well as variations on which website(s) an advertisement appears (*i.e.*, TheKnot.com and/or WeddingWire.com). L. Decl., ¶¶ 7–8, 18. Vendors choose one of these packages and select at least one target region, such as "New York City" or "Orange County," and business category, such as "photography" or "reception venue"—selections designed to connect couples with vendors applicable to their

target market and goals. *Id.,* ¶¶ 13, 18.

After initial contact, once a vendor is ready to sign up, a sales representative from The Knot shares a personalized sales quote with the vendor by email and/or within The Knot's vendor-facing portal. *Id*., ¶¶ 13, 17. After receiving its personalized sales quote, a vendor can complete its contract with The Knot through online checkout, which is now done exclusively through the WeddingPro portal, but has been an option available to most vendors since prior to the launch of the WeddingPro portal. *Id*., ¶ 19. Prior to a change in policy in 2023, a vendor also could elect to complete checkout over the telephone with its sales representative. *Id*., ¶¶ 23-24.

During the online checkout process, a vendor typically signs up for WeddingPro through the link sent by its sales representative, logs in to the portal, and confirms its subscription selections. *Id*., ¶¶ 16-20. The Knot's Terms of Purchase are then presented in their entirety in a scroll box. *Id*., ¶ 20. As the Terms of Purchase explain, the "Agreement" between The Knot and the vendor comprises the Terms of Purchase "along with any Specific Contract Conditions form attached herein or any order form accepted by Customer or entered into between the parties ('Order Form'), the Terms of Use … and Privacy Policies [on TheKnot.com and WeddingWire.com]." L. Decl., Ex. A. [2] The Terms of Purchase not only incorporate the Terms of Use by reference, but they also contain a hyperlink to the Terms of Use on TheKnot.com and WeddingWire.com. *Id.*; *see* § II.D, *infra*. While both the Terms of Purchase and Terms of Use apply to all vendors with paid subscriptions, the Terms of Use contain a conflicts clause stating that, in the event of a conflict

---

[2] The Terms of Purchase also include an Entire Agreement provision defining the Agreement as "including any documents incorporated by reference" and "supersed[ing] all proposals and prior discussions and writings between the parties with respect thereto." L. Decl., Ex. A.

between the Terms of Use and a vendor's Terms of Purchase, the Terms of Purchase apply. L. Decl., ¶ 37, Ex. B at §2. b.

On the sign-up page, after the vendor scrolls through the Terms of Purchase, is a check box with the phrase "I agree to Terms of Purchase". L. Decl., ¶¶ 20–21. A vendor cannot complete its agreement online and sign up for a subscription unless it scrolls through and agrees to the Terms of Purchase. *Id*.

Prior to 2023, a vendor could alternatively check out over a telephone call with a sales representative from The Knot. *Id.*, ¶¶ 23-24. Vendors that signed up this way reviewed the forms with The Knot's representative over the telephone, confirmed their product selections and their agreement to the Terms of Purchase, and provided their payment information over the telephone. *Id.*

In all checkout formats, after a vendor consents to the Agreement, the vendor receives an email containing a purchase order confirmation with the Terms of Purchase included. *Id.*, ¶ 25; *see also* Dkt. 1, ¶ 56. Additionally, before a vendor's subscription renews, The Knot sends an email notice about the renewal and directions regarding where to access the renewal information and applicable Terms of Purchase. *See e.g.*, L. Decl., ¶¶ 46, 51, 59, 65. Vendors also can access the operative Terms of Purchase any time through their WeddingPro portal. *Id.*, ¶ 28.

Whether completing the transaction online or over the telephone with a sales representative, the sign-up process is just the start of a vendor's onboarding process. All vendors (including vendors that checked out by telephone) need to create an account and log on to WeddingPro to manage their listings and advertisements. *Id.*, ¶¶ 26–27. Vendors use WeddingPro to customize their storefronts and connect with interested couples on The Knot's websites. *Id,* ¶ 27.

### C. The Knot's Terms of Purchase Agreement to Arbitrate

As explained above, all vendors that enter into an agreement to advertise their services through The Knot agree to its Terms of Purchase. These Terms of Purchase include an arbitration provision, which has remained materially unchanged since

July 2019. *Id.*, ¶ 31.[3] The arbitration provision in the Terms of Purchase is conspicuously introduced with a bold capitalized heading, "**ARBITRATION, CLASS ACTION WAIVER & JURY WAIVER**". L. Decl., ¶ 30, Ex. A. It includes, also in all-capital letters, the following directive: "PLEASE READ THE FOLLOWING PARAGRAPHS CAREFULLY BECAUSE THEY REQUIRE YOU AND US TO AGREE TO RESOLVE ALL DISPUTES BETWEEN US THROUGH BINDING INDIVIDUAL ARBITRATION." L. Decl., ¶ 30, Ex. A. The arbitration provision states, in relevant part, as follows:

> *Agreement to Binding Arbitration.* You understand and agree that any dispute, claim, or controversy arising out of or relating to this Agreement, the parties' relationship with each other and/or your use of and access to the Site or the services, including, but not limited to, claims as to whether any services rendered by us or persons employed or engaged by us were improperly, negligently, or incompetently rendered, and any claim or controversy as to arbitrability ("Dispute"), shall be finally and exclusively resolved by binding arbitration administered by the American Arbitration Association ("AAA") in accordance with the provisions of AAA's Commercial Arbitration Rules and Mediation Procedures and Consumer Related Disputes Supplementary Procedures, excluding any rules or procedures governing or permitting class actions, and not by a lawsuit or resort to court process, except as Maryland or any other applicable state law provides for judicial review of arbitration proceedings. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve any and all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this agreement to arbitrate, including, but not limited to any claim that all or any part of this agreement is void or voidable. The parties agree to treat the arbitration proceedings and any related discovery confidential. The terms of this section govern in the event they conflict with the rules of the AAA.

L. Decl., ¶ 30, Ex. A.

---

[3] Three minor changes were made to the arbitration clause after July 2019. *See,* L. Decl., ¶31. On September 2, 2021: (i) "solely" was added in connection with the requirement to arbitrate in Montgomery County, Maryland; (ii) "IF ANY" was inserted into the arbitration disclaimer; and (iii) "resolved" replaced "settled" in the arbitrability clause. *Id.*

Although the Terms of Purchase include an arbitration agreement, no vendor is required to be bound by it. Rather, all vendors are given the option to revoke consent to arbitration (within 30 days of accepting the agreement or following notice of material change) and are provided an email template to do so. L. Decl., ¶ 30, Ex. A. The Terms of Purchase specify Montgomery County, Maryland as the venue for arbitration. L. Decl., ¶ 30, Ex. A. They also select Maryland law to govern the parties' agreement. L. Decl., Ex. A.

In addition to a vendor's acceptance of the Terms of Purchase during sign-up, the Terms of Purchase also set forth, under a separate header, a conspicuously labeled "**ACCEPTANCE**" provision. L. Decl., ¶¶ 33-34, Ex. A. This provision provides that acceptance of the Terms of Purchase is established at the earliest of the following: a vendor's written or electronic signature on an Order Form or similar document, the submission or verification of advertising content, or the "first display of an advertisement or performance or delivery of the service." L. Decl., ¶ 33, Ex. A.

### D. The Knot's Terms of Use Agreement to Arbitrate

As noted above, the Terms of Purchase incorporate and include hyperlinks to The Knot's Terms of Use as part of the "Agreement" that vendors enter when contracting to advertise through The Knot. L. Decl., ¶ 32, Ex. A. Thus, by agreeing to the Terms of Purchase, vendors also agree to the Terms of Use. In addition, anyone who uses or accesses The Knot's websites, mobile applications, or online or offline services—whether as a business advertising or an individual wedding planning—is subject to The Knot's Terms of Use. L. Decl., Ex. B.

Vendors also separately and expressly agree to the Terms of Use. Indeed, many do so prior to agreeing to the Terms of Purchase, such as through a vendor inquiry form. L. Decl., ¶ 10. In order to submit the inquiry, a vendor acknowledges: "By submitting and sharing your information you agree to WeddingPro's terms of use and privacy policy," with The Knot's Terms of Use and Privacy policy hyperlinked in that text. *Id.*, ¶¶ 11-12. This acknowledgement has existed since at

least July 2021 on TheKnot.com and at least July 2019 on WeddingWire.com. Bina Decl., Exs. 1-2; *see also* L. Decl., ¶¶ 11-12**.**

Even if a vendor does not use an inquiry form, all vendors also separately agree to the Terms of Use when setting up their WeddingPro account, a requirement for a vendor to manage their advertisements on the site. L. Decl., ¶ 16.

Like the Terms of Purchase, the Terms of Use contain an arbitration clause. The first section of the Terms of Use clearly, and in bold capitalized text, states:[4]

> **PLEASE CAREFULLY REVIEW SECTION 22 "MANDATORY ARBITRATION AND CLASS ACTION WAIVER" SET FORTH BELOW AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH US ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. BY ENTERING THESE TERMS, YOU EXPRESSLY ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS INCLUDED HEREIN AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION**.

*Id.*, ¶ 36, Ex. B. Section 22 includes a bold and capitalized heading stating "**MANDATORY ARBITRATION AND CLASS ACTION WAIVER[.] PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT**." *Id.*, ¶ 35, Ex. B.[5] The Terms of Use provide that mandatory arbitration applies to "any and all disputes between you and [The Knot]," including "claims arising out of or relating to any aspect of the relationship between you and [The

[4] The description herein applies to the Terms of Use as of the filing of the Complaint (April 28, 2025). L. Decl., ¶¶ 35–36, Ex. B. Although other provisions of the Terms of Use have been amended over time, The Knot's Terms of Use have contained the same arbitration clause since January 1, 2020. L. Decl., ¶ 36. And, The Knot's Terms of Use have had some form of an arbitration clause since at least November 16, 2017. *Id.*

[5] Both arbitration disclaimers have existed in the Terms of Use since January 1, 2020. L. Decl., ¶¶ 35-36.

Knot], whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." *Id.*, ¶ 35, Ex. B.

As with the Terms of Purchase, the Terms of Use's arbitration provision delegates questions of scope and arbitrability to the arbitrator, stating that the "[t]he arbitrator (and not any federal, state, or local court or agency) shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of these Terms." *Id.*, ¶ 35, Ex. B. The Terms of Use provide that arbitration is governed by the Federal Arbitration Act and that Maryland law applies. *Id.*, ¶ 35, Ex. B. Similar to the Terms of Purchase, the Terms of Use provide the Plaintiffs with a 30-day window to contact The Knot to opt out of arbitration. *Id.*, ¶ 35, Ex. B.

### E. Plaintiffs' Valid and Binding Agreements to Individual Arbitration

Plaintiffs are wedding vendors that entered into contracts with The Knot to advertise their services to potential clients through The Knot's platforms. In entering this business-to-business arrangement for advertising services, each Plaintiff agreed to arbitrate its claims in this action by accepting The Knot's Terms of Purchase and, alternatively and independently, by accepting The Knot's Terms of Use. Although the dates of initial contract formation differ, each Plaintiff has affirmatively assented to virtually identical arbitration provisions. All had the opportunity prior to completing the transaction to review and/or request the Terms of Purchase and Terms of Use, and all received a copy of the Terms of Purchase immediately following the transaction and continued with the performance of the Agreement thereafter. None attempted to exercise the contractual right to withdraw from the arbitration provision. *See, e.g.,* L. Decl., ¶¶ 39-41.

#### 1. Plaintiff Rodman

After nearly a year of "browsing" the Knot's platforms "to learn more about The Knot's services," Plaintiff Rodman signed up for a subscription to advertise its

business with The Knot. Dkt. 1, ¶¶ 46-49.[6]

Rodman claims to have had an introductory call with The Knot on October 12, 2023. *Id.*, ¶¶ 53-54. Rodman signed up for a subscription through the online checkout process on WeddingPro that day, with a payment period starting on October 17, 2023. L. Decl., ¶¶ 42, 45, Ex. C. To complete its business's registration, Rodman affirmatively checked a box agreeing to the Terms of Purchase. *Id.*, ¶ 43. In signing up for a WeddingPro account, Rodman also agreed to the Terms of Use. *Id.,* ¶¶ 16, 42; *see supra* § II.D. Following the transaction, Rodman received an automated purchase confirmation that included the Terms of Purchase. L. Decl., ¶ 44. The operative Terms of Purchase also would have been available on Rodman's WeddingPro portal. *Id.*, ¶¶ 28, 47.

Rodman never exercised its right to opt out of its agreement to arbitrate with The Knot. *Id.*, ¶ 41. Rodman's contract renewed on October 17, 2024. *Id.*, ¶ 46. Before the contract renewed, The Knot would have emailed Rodman with instructions to access renewal details and the applicable Terms of Purchase—that includes the arbitration clause—via the WeddingPro portal. *Id.,* ¶ 46. Rodman's contract was terminated in November 2024. *Id.*, ¶ 48.

**2. Plaintiff Santa Fe**

Plaintiff Santa Fe signed up with The Knot and accepted The Knot's Terms of Purchase on August 28, 2020. *Id.*, ¶ 49. Following an initial discussion with a sales representative regarding its order details, Santa Fe completed its checkout over the telephone with a sales representative. *Id.*, ¶ 49. As part of this process, the sales representative would have highlighted the Terms of Purchase for the vendor and provided an opportunity to address any questions before finalizing the transaction by telephone. *Id.*, ¶ 24. Shortly after completing the telephone transaction, Santa

---

[6] Defendant's citations to Plaintiffs' admissions within the Complaint (Dkt. 1) are not and should not be construed as agreement or response to any allegations to the Complaint. Dkt. 18.

Fe received a purchase confirmation with the Terms of Purchase. *Id.*, Ex. D. Thereafter, Santa Fe had to set up its WeddingPro account and accept the Terms of Use in that process. L. Decl., ¶¶ 16, 27, 50.

From 2021 to 2024, Santa Fe exercised consecutive one-year renewals. *Id.*, ¶ 51. Prior to each renewal, Santa Fe would have received an email from The Knot with directions to visit its WeddingPro portal to view the renewal information, including the Terms of Purchase. *Id.* The operative Terms of Purchase and subscription information were also always readily available on Santa Fe's WeddingPro portal. *Id.*, ¶¶ 28, 52. Santa Fe never opted out of its agreement to arbitrate with The Knot. *Id.*, ¶ 41. Santa Fe's contract was terminated in September 2024. *Id.*, ¶ 53.

3. **Plaintiff Emme**

Emme maintained a seven-year relationship with The Knot, beginning with its initial sign-up in July 2017 and ending in August 2024. *Id.*, ¶¶ 54, 59-60. Emme's initial sign-up predated the merger between The Knot and WeddingWire, and as such, the existence of the WeddingPro vendor-facing website. *Id.*, ¶¶ 3, 14, 54. However, Emme's account was transitioned to WeddingPro when Emme renewed its contract for advertising services on July 29, 2022. *Id.*, ¶¶ 15-16, 56. As a part of that process, Emme had to sign up for a WeddingPro account, reaffirm its agreement to the operative Terms of Purchase to renew its subscription, and agree to the Terms of Use. *Id.*, ¶¶ 55-56. Through that online checkout process on WeddingPro, Emme was presented with the Terms of Purchase and affirmatively assented to them with a check box. *Id.*, ¶ 56. Emme received a copy of the Terms of Purchase following the transaction and also had access to them on its WeddingPro portal. *Id.*, ¶¶ 28, 57-58, Ex. E.

Emme's contract renewed in 2023. L. Decl., ¶ 59. Before the renewal, Emme would have received an email from The Knot with directions to visit its WeddingPro portal to view the renewal terms and Terms of Purchase. *Id.* Emme's contract was

terminated in August 2024. *Id.*, ¶ 60. Emme never attempted to opt out of its agreement to arbitrate with The Knot. *Id.*, ¶ 41.

4. **Plaintiff Morina**

Morina entered its initial contract with The Knot in 2019 but terminated that agreement later that year. *Id.*, ¶ 61. In February 2020, however, Morina entered into a new contract with The Knot. *Id.*, ¶ 62, Ex. F. During that February 2020 sign-up process, Morina spoke with a sales representative, discussed the subscription details, and then completed the transaction over the telephone with the representative. L. Decl., ¶¶ 24, 62. Following the completed telephone transaction, The Knot sent Morina a purchase confirmation that included the Terms of Purchase. *Id.*, ¶ 63.

In July 2021, Morina created its WeddingPro account and accepted the Terms of Use through that process. *Id.*, ¶¶ 16, 64. In addition, through WeddingPro, Morina always had access to the operative terms governing its subscriptions, including the Terms of Purchase. *Id.*, ¶¶ 28, 66.

From 2020 until Morina cancelled its contract in May 2025, Morina's contract renewed on an annual basis. *Id.*, ¶¶ 65, 67. Prior to each renewal, Morina would have received an email from The Knot with directions to visit its vendor portal to view the renewal terms and the operative Terms of Purchase. *Id.*, ¶ 65. Morina never attempted to opt out of its agreement to arbitrate with The Knot. *Id.*, ¶ 41.

**F. Plaintiffs Improperly File This Action in Court**

Despite their express agreements to arbitrate, Plaintiffs initiated this putative class action lawsuit on April 28, 2025, in court, alleging claims pursuant to California's Unfair Competition Law and New York's Consumer Protection laws, as well as asserting common law unjust enrichment and intentional misrepresentation claims. Dkt. 1. Plaintiffs' claims revolve around dissatisfaction with The Knot's advertising services—particularly related to leads in response to their advertisements on The Knot's platforms. Based on the same alleged violations,

Plaintiffs seek punitive damages, compensatory damages, disgorgement, unjust enrichment, restitution, and injunctive relief, on behalf of themselves and a putative class. *See id.*, ¶¶ 162-248, Prayer for Relief.

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the arbitration agreements in both the Terms of Purchase and the Terms of Use. Whether or not expressly mentioned in an agreement, the FAA presumptively applies to (1) any written agreement to arbitrate that (2) appears in a "contract evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2; *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 62–64 (1995) (applying FAA to arbitration agreement even where it is not expressly mentioned and holding that choice of law provision does not govern arbitration clause). The term "involving commerce" is interpreted broadly, such that any arbitration agreement affecting interstate commerce in any way is governed by the FAA. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277 (1995). Here, the Terms of Purchase is a "contract evidencing a transaction involving [interstate] commerce" because its purpose is to transact for advertising and advertising-related services on The Knot's platforms, which are offered to vendors across the United States. *See* L. Decl., ¶ 4. The same is true of the Terms of Use, which also expressly state that the FAA applies. L. Decl., ¶ 35, Ex. B.

The purpose of the FAA "is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). Under the FAA, arbitration agreements are presumptively "valid, irrevocable, and enforceable." 9 U.S.C. § 2. By its terms, the FAA "leaves no place for the exercise of discretion by a [trial] court, but instead mandates that [trial] courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis

in original). A court must interpret arbitration provisions liberally, resolving all doubts in favor of arbitration: "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Accordingly, as the Ninth Circuit has observed, "[t]he standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

Under the FAA, a party seeking to compel arbitration bears the initial burden of proving "the existence of a valid, written agreement to arbitrate," and the burden thereafter shifts to the party opposing arbitration. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). Given the existence of a facially valid arbitration agreement covering Plaintiffs' claims, the burden is on Plaintiffs to prove by a preponderance of the evidence that arbitration should be denied. *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (under the FAA, the party opposing arbitration bears burden to show a generally applicable contract defense to arbitration agreement). Plaintiffs cannot do so.

## IV. ARGUMENT

Plaintiffs' claims are subject to a valid and binding agreement to arbitrate. Plaintiffs are businesses that agreed to the contractual Terms of Purchase (as well as the Terms of Use) as part of doing business with The Knot. Each Plaintiff was provided and had ready access to the Terms of Purchase that included an agreement to individual arbitration. In addition to expressly consenting, by authorizing and completing their transactions and continuing to use The Knot's services under their Agreements, the Plaintiffs also accepted the Terms of Purchase in accordance with the specified "Acceptance" conditions. In addition, and in the alternative, each Plaintiff agreed to the Terms of Use, including its arbitration provision. Despite being given the express opportunity to opt out of arbitration in both cases, no Plaintiff chose to do so.

Both the Terms of Purchase and Terms of Use explicitly delegate "exclusive authority" to the arbitrator to resolve "all disputes arising out of or relating to the interpretation, applicability, enforceability or formation" of the agreements to arbitrate[7]—including challenges to the arbitration provisions and questions of validity or voidability. Because the parties have, therefore, agreed to delegate any questions of arbitrability to an arbitrator, the limited issue before this Court is whether the delegation clause provision is unenforceable, a burden that rests on the Plaintiffs to demonstrate. *See Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 68 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."). Plaintiffs have not pled—nor could they establish—any basis to invalidate their agreements to arbitrate. Therefore, the Court should grant this motion and compel arbitration of Plaintiffs' claims.

### A. The Terms of Purchase's Agreement to Arbitrate Binds the Parties

In order to compel arbitration, a defendant must show an agreement to arbitrate exists between the parties. *See Naimoli v. Pro-Football, Inc*., 120 F.4th 380, 387 (4th Cir. 2024) ("[T]he existence of a contract is a precondition to enforcement of an arbitration clause.") (applying Maryland law).[8] Here, each

---

[7] L. Decl., Ex. A ("The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve any and all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this agreement to arbitrate, including, but not limited to any claim that all or any part of this agreement is void or voidable."); *see also* L. Decl., Ex. B.

[8] As noted in §II. C., *supra*, the Terms of Purchase specifies that Maryland law governs the parties' contractual relationship. The same principle has been held in California by the Ninth Circuit: *Knutson v. Sirius XM Radio Inc*., 771 F.3d 559, 565 (9th Cir. 2014) ("the party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.") (citing *Rosenthal v. Great W. Fin. Sec. Corp.,* 14 Cal. 4th 394, 413 (1996)).

Plaintiff agreed to arbitrate by agreeing to The Knot's Terms of Purchase. *See supra* § II. E.

As noted above, each Plaintiff, prior to contracting, had to, at minimum, work with a sales representative to discuss the details of their subscription. By the time that Plaintiffs initiated the transaction (whether online or by telephone), they each had a clear intention to contract with The Knot.

Plaintiffs Rodman and Emme cemented their consent to the Terms of Purchase through the online checkout process by checking the box "I agree to Terms of Purchase." L. Decl., ¶¶ 20, 42-43, 56. This method of acceptance is often referred to as a "clickwrap" agreement. *See, e.g., CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009) (defining "clickwrap" as "agreements that require a customer to affirmatively click a box on the website acknowledging receipt of an assent to the contract terms"). Even absent the additional factors that favor enforceability here—*i.e.*, a business-to-business relationship, a direct communication between the vendor and a representative of The Knot prior to signing up, and the express opportunity to opt out of arbitration—Maryland courts consistently find "clickwrap" arbitration agreements, standing alone, to be enforceable. *Id.* at 669; *also Zayanderoudi v. Nat'l R.R. Passenger Corp*., No. TJS-22-2455, 2023 WL 4744746, at *4 (D. Md. July 25, 2023) (granting motion to compel arbitration where "Plaintiff was required to affirmatively click the box manifesting her assent to the Terms and Conditions... and such 'clickwrap' agreements are fully enforceable").

Although Maryland law controls under the governing law provision in the Agreements, the state laws in Rodman and Emme's home states (California and Pennsylvania, respectively) similarly find clickwrap agreements to be enforceable.[9]

---

[9] Courts also routinely uphold forum selection clauses in arbitration agreements, especially in the business-to-business context. *See e.g., Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 558 (2004) (California Court of Appeal

*See e.g.*, *B.D. v. Blizzard Entertainment, Inc.,* 76 Cal. App. 5th 931, 946 (2022) ("California and federal courts have reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding . . . clickwrap agreements to be enforceable.") (internal citation omitted); *Dickey v. Ticketmaster LLC*, CV-18-9052-GW(GJSx), 2019 WL 9096443, *10 (C.D. Cal. March 12, 2019) (granting motion to compel arbitration because the plaintiff assented to Ticketmaster's Terms of Use by clicking "Sign Up" on the account registration page); *Liptak v. Accelerated Inventory Mgmt., LLC,* No. 2:20-CV-967, 2021 WL 650514, at *2 (W.D. Pa. Feb. 19, 2021) (holding that "because clickwrap agreements are generally enforced by the courts and because of the strong federal policy favoring arbitration, the arbitration provision in the clickwrap agreement shall be enforced").

Plaintiffs Santa Fe and Morina entered their initial agreements over the telephone with sales representatives, and after completing their transactions, each was emailed a copy of its written agreement, including the Terms of Purchase. L. Decl., ¶¶ 24, 49, 62-63. Completing the transaction on the telephone followed by the receipt of a purchase confirmation and the governing terms is no less binding than the online checkout process. *See, e.g., Bandy v. Move, Inc*., No. 2:24-cv-10492-SB-JPR, 2025 WL 1000334, *9 (C.D. Cal. March 3, 2025) (holding plaintiffs had adequate notice of terms discussed with defendant's sales representative by telephone, where plaintiffs received a subsequent confirmation email).

Moreover, even if acceptance of the Terms of Purchase at sign-up could be challenged (it cannot), all Plaintiffs, upon receiving the purchase confirmation and Terms of Purchase, took actions that clearly signified their acceptance to the Terms of Purchase. These actions included their "submission or verification of any advertising or listing/storefront content" and using The Knot's services. L. Decl.,

---

reversing order staying arbitration and upholding forum selection provision in an arbitration agreement for a business-to-business transaction).

¶¶ 25-27, Ex. A; *also, e.g., Rouhi v. Comcast Ctr*., 2019 U.S. Dist. LEXIS 235693, *10 (D. Md.) (where a services agreement stated that using the defendant's services constituted acceptance of its terms, the court held that the plaintiff's continued use of the defendant's services constituted acceptance).

Plaintiffs admit they entered into contracts for advertising services with The Knot. *See e.g.* Dkt. 1, ¶¶ 56, 75, 92, 105, 118. Certain Plaintiffs also admit to renewing their subscription multiple times, and all Plaintiffs admit to benefitting from business generated from the Agreements.[10] *See id.*, ¶¶ 62, 77, 96, 105, 106, 112. Accordingly, all Plaintiffs are subject to the Terms of Purchase and its arbitration clause.

**B. The Scope of Arbitration Must Be Determined by the Arbitrator**

Once a court determines that a valid arbitration agreement exists and delegates issues of arbitrability to an arbitrator, the inquiry ends, and the action must be compelled to arbitration. *Henry Schein*, 586 U.S. at 69. A court may not decide "the threshold arbitrability question—that is, whether their arbitration agreement applies to the particular dispute"—if the parties have delegated that question to an arbitrator. *Id.* at 65; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010); *Jackson v. Airbnb, Inc*., 639 F. Supp. 3d 994, 1003 (C.D. Cal. 2022) ("Where an arbitration agreement

---

[10] To the extent certain Plaintiffs had agreed to earlier versions of the Terms of Purchase pre-dating the current iteration of the arbitration clause, such contracts were superseded by Plaintiffs' subsequent consent to more recent versions. *See GKD-USA, Inc. v. Coast Mach. Movers*, 126 F. Supp. 3d 553, 556-557 (D. Md. 2015) (quoting *United States v. Gilman*, 360 F. Supp. 828 (D. Md. 1973)) ("'where two written contracts differ in terms or conditions regarding the same subject matter, the terms or conditions of the later contract supersede those of the earlier contract.'"); *see also Bazine v. Kelly Servs. Global, LLC,* No. 22-cv-07170-BLF, 2023 WL 4138252 at *4 (N.D. Cal. June 21, 2023) (quoting *Frangipani v. Boecker*, 64 Cal. App. 4th 860, 863 (1998)) ("Where there is an inconsistency between two agreements both of which are executed by all of the parties, the later contract supersedes the former.").

clearly delegates the question of arbitrability to the arbitrator there is no exception that allows the Court to address questions of arbitrability.").

Here, the Terms of Purchase contain precisely such a delegation provision. Plaintiffs agreed to arbitrate "any and all disputes arising out of or relating to the ***interpretation, applicability, enforceability or formation of this agreement to arbitrate, including, but not limited to any claim that all or any part of this agreement is void or voidable***." L. Decl., ¶ 30, Ex. A. (emphasis added). The express language of the Terms of Purchase mandates that the arbitrator—not the Court—resolve questions of arbitrability and enforceability. Absent a demonstration of the delegation clause's invalidity—a burden Plaintiffs have not pleaded and cannot meet—the Court must direct Plaintiffs' claims to arbitration.

### C. Alternatively, Plaintiffs Are Also Bound by the Arbitration Agreement in the Terms Of Use

In the alternative, Plaintiffs are also bound to arbitrate under The Knot's Terms of Use. As discussed above, Plaintiffs agreed to the Terms of Use either when making an initial inquiry to The Knot and/or when setting up their WeddingPro accounts. *See* § II. D., *supra*. At that time, they were informed that, by submitting their information or creating an account, they were agreeing to the Terms of Use. *Id.*

Courts in all the jurisdictions where Plaintiffs reside routinely uphold this type of agreement, often referred to as sign-in wrap. *See, e.g.*, *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal. App. 5th 931, 935-36 (2022) (holding there was a valid arbitration agreement where users acknowledged a sign-in pop-up that they "have read and understood the [Agreement]" that contained an arbitration provision); *Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) (holding that plaintiff was "highly likely to succeed in showing that Defendant received notice of the Terms of Use and assented to them by actually using the website" where site stated "Use of this website is subject to express Terms

of Use" hyperlinked to the terms); *Salameno v. Gogo Inc*., No. 16-CV-0487, 2016 WL 4005783, *7 (E.D.N.Y. July 25, 2016) (upholding arbitration provision in terms of use where the webpage sign-up read "By clicking 'Sign In' I agree to the terms of use and privacy policy" and the terms were hyperlinked); *Dhruva v. CuriosityStream, Inc.,* 131 F.4th 146, 155 (4th Cir. 2025) (applying Maryland law, reversing denial of motion to compel arbitration where users agreed that by subscribing, they agreed they had read the hyperlinked terms of use containing the arbitration clause); *Gonzales v. Brinker Int'l Payroll Co., LP*, No. 15-CV-711 MCA/GJF, 2016 WL 9818324, *4 (D.N.M. Nov. 30, 2016) (compelling arbitration where the arbitration policy was hyperlinked on the defendant's website and the plaintiff clicked on a box agreeing to read it).[11] Accordingly, each of the named Plaintiffs is bound by The Knot's Terms of Use.

As with the Terms of Purchase, the Terms of Use contain a broad arbitration clause requiring the Plaintiffs to arbitrate "any claims arising out of or relating to any aspect of the relationship between you and [The Knot], whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." L. Decl., ¶ 35, Ex. B. Thus, the Terms of Use provide a separate, alternative basis to compel Plaintiffs to arbitration. *See supra* § II.D. Moreover, just like the Terms of Purchase, the Terms of Use delegate to the arbitrator all threshold questions of arbitrability. L. Decl., ¶ 35, Ex. B. This Court need only determine if the arbitration provision in the

---

[11] The Terms of Use state that "[b]y using or accessing" The Knot's "Services, you confirm your agreement to be bound by these Terms." L. Decl., Ex. B. Services are defined broadly to include "all websites and mobile applications owned and operated by us or our affiliates that link to these Terms, and related online and offline services thereto." *Id*. Thus, Plaintiffs' access and use of The Knot's websites and services also constitutes acceptance of the Terms of Use. *Rouhi*, 2019 U.S. Dist. LEXIS 235693, *10 (where a services agreement stated that using defendant's services constituted acceptance of its terms, the court held that plaintiff's continued use of defendant's services constituted acceptance).

Terms of Use is valid—and, plaintiffs have not and cannot show any reason to invalidate it.

Accordingly, whether analyzed under the Terms of Purchase or the Terms of Use, the result is the same. Plaintiffs must be compelled to arbitration.

## V. THE REMAINDER OF THE CASE MUST BE STAYED PENDING ARBITRATION

Under the FAA, a court must stay proceedings in an action when it is "satisfied that the issue involved in such suit or proceeding is referable to arbitration[.]" 9 U.S.C. § 3, *Moses H. Cone Memorial Hosp.*, 460 U.S. 1, 27 (FAA's stay provision requires courts to issue "speedy relief when a dispute is referable to arbitration."). The Knot has demonstrated that the parties agreed to submit to arbitration the claims in this action and, therefore, the action must be referred to arbitration. Accordingly, any further proceedings on Plaintiffs' action must be stayed.

## VI. CONCLUSION

For the foregoing reasons, The Knot respectfully requests the Court grant its motion to compel binding arbitration on all of Plaintiffs' claims and stay this action pending resolution of arbitration.

Dated: June 23, 2025

LATHAM & WATKINS LLP

By: */s/ Jessica Stebbins Bina*

Jessica Stebbins Bina (SBN 248485)
Gregory W. Swartz (SBN 308071)
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel.: (424) 653-5500
Fax: (424) 653-5501
*jessica.stebbinsbina@lw.com*
*greg.swartz@lw.com*

Matthew A. Brill *(pro hac vice forthcoming)*
Andrew Prins *(pro hac vice forthcoming)*

555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
*matthew.brill@lw.com*
*andrew.prins@lw.com*

*Attorneys for Defendant The Knot Worldwide Inc.*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant The Knot Worldwide Inc., certifies that this brief contains 6,915 words, which complies with the word limit of L.R. 11-6.1, and is 22 pages long, which complies with Judge Fernando M. Olguin's Initial Standing Order.

Dated: June 23, 2025

By: */s/ Jessica Stebbins Bina*
Jessica Stebbins Bina